**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>TIEL TRUST I FBO PAULA T.<br>DOUGLASS,<br><br>Debtor. | Bankruptcy Case No. 23-14888 TBM<br><br>Chapter 11 |

---

**MEMORANDUM OPINION AND ORDER DISMISSING CASE**

---

### I.      Introduction.

The Debtor, Tiel Trust I FBO Paula T. Douglass (the "Trust"), recently filed for protection under Chapter 11 of the Bankruptcy Code.[1]  The Trust is a spendthrift trust created decades ago by Ira J. Terry (the "Grantor") under Texas law through a Trust Agreement.  The Trust was created for the "primary benefit" of the Grantor's daughter, Paula T. Douglass ("Ms. Douglass").  So, the Trust is strictly a family affair.  According to the Trust Agreement, the main purpose of the Trust was to "distribute" to Ms. Douglass "such amounts of trust income and principal as are necessary . . . to provide for the health, support, and maintenance" of Ms. Douglass to allow her to maintain her "accustomed standard of living."

The main asset of the Trust is a luxury residence located at 42400 Highway 82, Aspen, Colorado (the "Aspen Home").  According to the Trust, the Aspen Home is worth about $13 million.  Ms. Douglass is the only resident of the Aspen Home and enjoys living there rent-free.  Some years ago, in connection with the Trust's previous unsuccessful bankruptcy case, the Trust acknowledged that it was obligated to pay not less than $5,286,070.80 to creditors 42400 Highway 82 Acquisition, LLC and 42400 Highway 82 Acquisition Sub Debt, LLC (together, the "Secured Creditors").  Such debt is secured by liens against the Aspen Home.  The debt owed to the Secured Creditors has grown substantially since then because the Trust has not paid anything to the Secured Creditors in many years.  The Trust sought bankruptcy relief solely to avoid foreclosure on the Aspen Home by the Secured Creditors.  Other than the Aspen Home (and antiques and artwork located therein), the Trust owns little else (two financial accounts with nominal balances and some old railroad tank cars).  Besides the Secured Creditors, the Trust has only three creditors: a lawn and garden service; the Pitkin

---

[1]      All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.  Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

County Public Trustee; and Ms. Douglass' step-son who claims to be entitled to receive reimbursements for Trust expenses he fronted.

The Secured Creditors filed a Motion to Dismiss raising two arguments. First, the Secured Creditors contend that the Trust is not eligible for bankruptcy protection (per Sections 101(9), 101(41), 109(a), and 109(d)) because the Trust is not a "business trust." Second, the Secured Creditors argue that the Trust filed this case (its second recent bankruptcy) in bad faith such that dismissal is appropriate under Section 1112(b).

Regarding eligibility, both the Trust and the Secured Creditors agree that the Bankruptcy Code limits the eligibility of trusts to file for bankruptcy. Only a "business trust" may do so. Consequently, the eligibility issue boils down to a single question: Is the Trust a "business trust"? The definition of the phrase "business trust" must be derived from the ordinary legal meaning of the term when Congress passed the Bankruptcy Code. Based on such legal meaning and the undisputed facts (introduced by way of a proffer process), the Court concludes that the Trust is not a "business trust." That result is patent because the Trust was not created and maintained for a business purpose and does not have any of the other attributes of a "business trust." Since the Trust is not a "business trust," it is not eligible for bankruptcy protection and the case must be dismissed. Given the Court's determination on eligibility, the Court need not consider the bad faith filing argument for dismissal also raised by the Secured Creditors.

## II.      Jurisdiction and Venue.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The dispute over the Trust's bankruptcy eligibility and alleged bad faith filing constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate) and (b)(2)(O) (other proceedings affecting liquidation of assets of the estate). Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409. Neither the Trust nor the Secured Creditors have contested the Court's jurisdiction to enter final judgment regarding the Trust's eligibility to seek bankruptcy protection. And, neither party has attacked the propriety of venue in the Court.

## III.      Procedural Background.

### A.      The Trust's First Bankruptcy Case.

On November 6, 2018, the Trust filed for protection under Chapter 11 of the Bankruptcy Code in the case captioned: *In re Tiel Trust FBO Paula T. Douglass*, Case No. 18-19697 TBM (Bankr. D. Colo.) (the "First Case").[2] A few weeks later, the Trust submitted its Statement of Financial Affairs and Schedules.[3] In its Schedule A/B, the Trust identified ownership of the Aspen Home (located at 42400 Highway 82, Aspen,

---

[2]      Docket No. 1 in First Case. The Court will refer to particular documents contained in the CM/ECF docket for the First Case using the convention: "Docket No. ___ in First Case."

[3]      Docket Nos 27-31 in First Case.

Colorado) as its most significant asset.[4]  The Trust listed the value of the Aspen Home as $11,600,000.00.[5]  In its initial Schedule D, the Trust noted that it owed the Secured Creditors at least $3,369,385.19.[6]  The Trust later amended its Schedule D to increase the amount of the debt owed to one of the two Secured Creditors for a new total of $4,969,385.19.[7]  The Trust filed the First Case to stop the Secured Creditors from foreclosing on the Aspen Home.[8]

Early in the First Case, on December 17, 2018, the Secured Creditors filed a "Motion to Dismiss" (the "First Case Motion to Dismiss").[9]  In the First Case Motion to Dismiss, the Secured Creditors contended that the Trust is not eligible for bankruptcy protection (per Sections 101(9), 101(41), 109(a), and 109(d)) because the Trust is not a "business trust."  Second, the Secured Creditors argued that the Trust filed the First Case in bad faith such that dismissal was appropriate under Section 1112(b).[10]  The Trust objected to the First Case Motion to Dismiss.[11]  However, the First Case Motion to Dismiss was not prosecuted to decision.  The Trust filed two proposed Chapter 11 reorganization plans in the First Case.[12]  Neither was confirmed.  Later, the Trust and the Secured Creditors stipulated to dismissal of the First Case.[13]  On March 25, 2020, the Court dismissed the First Case.[14]

## B.    The Trust's Second Bankruptcy Case.

On October 24, 2023, the Trust filed for protection under Chapter 11 of the Bankruptcy Code in the case captioned: *In re Tiel Trust FBO Paula T. Douglass*, Case No. 23-14888 TBM (Bankr. D. Colo.) (the "Second Case").[15]  As it did with the First Case, the Trust filed for bankruptcy protection to stop the Secured Creditors from foreclosing on the Aspen Home.[16]  A few weeks later, the Trust submitted its Statement of Financial Affairs, Summary of Assets and Liabilities and Schedules,[17] none of which have been amended.  The Trust has not filed a proposed Chapter 11 plan of reorganization.

---

[4]     Docket No. 29 in First Case.
[5]     *Id.*
[6]     Docket No. 30 in First Case.
[7]     Docket No. 82 in First Case.
[8]     Docket No. 91 in First Case at 5-6.
[9]     Docket No. 43 in First Case.
[10]    *Id.*
[11]    Docket No. 52 in First Case.
[12]    Docket Nos. 90 and 114 in First Case.
[13]    Docket No. 149 in First Case.
[14]    Docket No. 150 in First Case.
[15]    Docket No. 1 in Second Case.  The Court will refer to particular documents contained in the CM/ECF docket for the Second Case using the convention: "Docket No. ___ in Second Case."
[16]    Docket No. 49 in Second Case at 10-12; Ex. 3 at 10.
[17]    Docket Nos. 23-29 in Second Case and Ex 2.  The Court will refer to Exhibits presented to the Court and admitted into evidence using the convention: "Ex. ___."

1.    **The Trust's Assets**.

In its Schedule A/B, the Trust identified as its most significant asset ownership of the Aspen Home (located at 42400 Highway 82, Aspen, Colorado).[18]  The Trust listed the value of the Aspen Home as $13,000,000.00.[19]  In addition to the Aspen Home, the Trust noted the following additional assets:

| Asset Type | Asserted Current Value |
|---|---|
| Plains Capital Account | $    1,606.61 |
| Union Bank of Switzerland Account | $    2,979.27 |
| Accounts Receivable | $        0.00 |
| Mutual Funds and Stock | Unknown |
| Artwork and Antiques in Aspen Home | $500,000.00 |
| Rail Road Tank Cars | $300,000.00 |
| Notes Receivable | $        0.00 |
| Property Damage Claim | Unknown |
| Lender Liability Claim | Unknown[20] |

2.    **The Trust's Liabilities**.

In its Schedule D, the Trust reported that the Secured Creditors held the only secured claims against the Trust in the aggregate amount of $9,300,415.93 (albeit that the Trust checked the box: "disputed").[21]  With respect to unsecured claims, the Trust listed only three claims:

| Creditor | Amount |
|---|---|
| Alpine Lawn & Garden Services LLC | $    2,004.38 |
| Pitkin County Public Trustee | $    2,677.44[22] |
| S. Preston Douglass Jr. | $511,801.00[23] |

S. Preston Douglass Jr. is the step-son of Ms. Douglass and also serves as a co-Trustee of the Trust along with his step-mother.

3.    **The Motion to Dismiss and Objection**.

On December 8, 2023, the Secured Creditors filed their "Motion to Dismiss Bankruptcy Case" (the "Motion to Dismiss").[24]  The Secured Creditors raised two

---

[18]    Docket No. 23 in Second Case and Ex. 2.
[19]    *Id.*
[20]    *Id.*
[21]    Docket No. 24 in Second Case and Ex. 2.
[22]    *Id.*  The Trust broke the amount owed to the Pitkin County Public Trustee into three separate claims.
[23]    Docket No. 24 in Second Case and Ex. 2.
[24]    Docket No. 40 in Second Case.

4

arguments.  First, the Secured Creditors contend that the Trust is not eligible for bankruptcy protection (per Sections 101(9), 101(41), 109(a), and 109(d)) because the Trust is not a "business trust."  Second, the Secured Creditors argue that the Trust filed this case (its second recent bankruptcy) in bad faith such that dismissal is appropriate under Section 1112(b).  The Secured Creditors elected to proceed pursuant to L.B.R. 2081-3 and provided notice of the objection deadline as well as the date selected for the initial hearing.  The Trust filed an "(I) Objection to Motion to Dismiss Chapter 11 Bankruptcy Case, and (II) Request for Evidentiary Hearing" (the "Objection").[25]

The Court conducted a Hearing on the Motion to Dismiss and Objection as scheduled on January 4, 2024.[26]  Counsel for the Secured Creditors appeared in person.  Counsel for the Trust appeared by telephone.  Consistent with L.B.R. 2081-3, the Secured Creditors proffered testimony of Ms. Douglass, S. Preston Douglass, Jr. (Ms. Douglass' step-son), and Anne Marie McPhee (foreclosure counsel for the Secured Creditors).  The Secured Creditors also proffered Exhibits 1-17.  The Trust did not object.  So, the Court admitted into evidence the Secured Creditors' Exhibits 1-17.  The Trust failed to comply with L.B.R. 2081-3 since, among other things, the Trust failed to timely submit a list of witnesses and exhibits (as required by L.B.R. 2081-3(d)).  Overruling the Secured Creditors' objection, however, the Court allowed the Trust to present testimonial proffers from Ms. Douglass and S. Preston Douglass, Jr.  The Trust proffered no exhibits.

At the conclusion of the evidentiary proffers, the Court asked of counsel for both the Secured Creditors and the Trust whether there were any factual disputes which may require an evidentiary hearing.  Counsel for the Secured Creditors responded that there were no factual disputes and the Court could decide the Motion to Dismiss and the Objection based upon the uncontested evidentiary proffers.  Counsel for the Trust contended that the Court would "benefit" from further development of evidence at a final hearing.  However, counsel for the Trust was unable to identify a single material factual dispute.  Accordingly, the Court determined that, in the absence of any material factual conflicts, no final evidentiary hearing was necessary and the Court could decide the issues based upon the evidentiary proffers.  Thus, the evidentiary record consists solely of the uncontested proffers.  Both the Secured Creditors and the Trust presented fulsome legal arguments based upon the evidence.

Thereafter, the Court took the bankruptcy eligibility and bad faith issues under advisement.  In the interim, the Court has evaluated all the exhibits admitted into evidence, considered the testimonial proffers, and reviewed the applicable law.  The disputed bankruptcy eligibility and bad faith issues are now ripe for decision.

---

[25]    Docket No. 49 in Second Case.
[26]    Docket No. 59 in Second Case.

## IV.     Findings of Fact.

The Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052 and 9014(c).[27]  All such findings of fact are based upon the proffered testimony and exhibits admitted at the Hearing as well as Court records.

## A.     Formation of the Trust.

On October 3, 1986, Ira J. Terry, as Grantor, executed a Trust Agreement (the "Trust Agreement") creating the Trust to benefit his family.[28]  The original trustee of the Trust was designated as Trust Corporation International.

The Trust Agreement created:

> . . . two trusts, equal in value.  One such trust shall be held for the primary benefit of the Grantor's daughter, PAULA T. DOUGLASS, and the other trust shall be held for the primary benefit of the Grantor's son-in-law, SAM P. DOUGLASS (each such person hereafter called the "Beneficiary" of his or her trust).

Tr. Agr. § 1.1.  Sam P. Douglass was Ms. Douglass' husband.[29]  He died in 2014 at which time the trust property contained in the separate trust for the benefit of her husband was "added to" or "merged" into the Trust.[30]  So, at this stage, there is only one Trust: the Debtor entity which filed for bankruptcy protection.  Ms. Douglass currently is a co-trustee of the Trust.[31]  The other co-trustee is her step-son, S. Preston Douglass, Jr.[32]

According to the Trust Agreement, Ms. Douglass is the "primary" beneficiary. The Trust Agreement requires the Trustee to make distributions to Ms. Douglass — that is its main purpose:

---

[27]     As required by Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052, this Order states "findings of fact specially and conclusions of law separately."  *See S.E.C. v. St. Anselm Explor. Co.*, 936 F. Supp. 2d 1281, 1285 n.6 (D. Colo. 2013).  "Any finding of fact more properly deemed a conclusion of law, or any conclusion of law more properly deemed a finding of fact, shall be as more properly characterized."  *Id.*, *see also Kolbe v. Endocrine Servs., P.C.*, 2022 WL 970004 (D. Colo. Mar. 31, 2022).  Furthermore, to the extent that any of the Procedural Background already identified in this Memorandum Opinion and Order constitutes facts, the Court incorporates such Procedural Background as part of the Court's findings of fact.

[28]     Ex. 1.

[29]     Ex. 3 at 12-14.

[30]     Ex. 1 at Section 1.6(a); Ex. 3 at 12-15.

[31]     Ex. 2 at 26-27 and 29; Ex. 3 at 49.  Ms. Douglass also was the sole trustee of the Trust at various times in the last 10-15 years.  Ex. 4 at 18;

[32]     Ex. 4 at 18; Ex. 12.

> The Trustee shall distribute to the Beneficiary [Ms. Douglass] . . . such amounts of trust income and principal as are necessary, when added to the funds reasonably available [to Ms. Douglass] . . . from all other sources known to the Trustee, to provide for the health, support, and maintenance of such distributee, in order to maintain [her], to the extent reasonably possible, in accordance with [her] accustomed standard of living.

Tr. Agr. § 1.1.  (The Trust Agreement also refers to "secondary" beneficiaries meaning "the nieces and nephews of PAULA T. DOUGLASS."  However, Ms. Douglass apparently does not have any nieces and nephews.  Instead, she has repeatedly confirmed that she is the "sole beneficiary" of the Trust.[33]  Accordingly, the Court does not consider provisions in the Trust Agreement pertaining to "secondary" beneficiaries.

The Trust is a classic spendthrift trust.  It states:

> Prior to the actual receipt of such property by any beneficiary, no property (income or principal) distributable under any trust created by this instrument shall be subject to anticipation or assignment by any beneficiary, or to attachment by or to the interference or control of any creditor or assignee of any beneficiary, or be taken or reached by any legal or equitable process in satisfaction of any debt or liability of any beneficiary, and any attempted transfer or encumbrance of any interest in such property by any beneficiary hereunder prior to distribution shall be absolutely and wholly void.

Tr. Agr. § 5.1.  Another part of the Trust Agreement reenforces such provision:  "no Beneficiary shall have the power pursuant to this section to appoint trust property to himself or herself, his or her creditors, his or her estate, or the creditors of his or her estate."  Tr. Agr. § 1.5.  So, the Trust is a spendthrift trust designed as an estate planning vehicle to protect assets for the benefit of Ms. Douglass.  Ms. Douglass repeatedly has acknowledged as much.  For example, during the Secured Creditors' proffer, the Secured Creditors noted that Ms. Douglass filed for personal bankruptcy protection in the case captioned:  *In re Paula Terry Douglass*, Case No. 17-34716 (Bankr. S.D. Tex.).  In that bankruptcy proceeding, Ms. Douglass took the position that the Trust was a spendthrift trust not available for her creditors.  In her Disclosure Statement, she stated:  "In 1986, Ira Terry created the Tiel Trust I as a spendthrift trust for the benefit of his . . . daughter Paula Douglass."  *See In re Paula Terry Douglass*, Case No. 17-34716 (Bankr. S.D. Tex.), Docket No. 133 at 13; Docket No. 46 at 37.

The Trust will terminate at the end of Ms. Douglass' life.  Tr. Agr. § 1.6.  Before then, Ms. Douglass has the absolute right to appoint and remove the trustee.  (As noted

---

[33]   Ex. 3 at 32; Ex. 11 at 12.

previously, Ms. Douglass and her step-son are the current trustees.)  The Trust was created under the Texas Trust Code and is governed by Texas law.  Tr. Agr. §§ 4.1 and 5.4.  In accordance therewith, the trustee of the Trust has the typical powers of a trustee of a spendthrift trust.  In addition to those powers covered in the Texas Trust Code, the trustee may: (1) "retain . . . any property transferred to the Trustee by the Grantor"; (2) "exchange, sell, or lease . . . for cash, property, or credit . . . all or any part of the assets of the trust"; (3) "borrow money from any source . . . and to mortgage, pledge, or in any manner encumber all or any part of the assets of any trust"; (4) "invest and reinvest . . . in any kind of property whatsoever"; (5) "register and carry any securities or other property in the name of the Trustee"; (6) "enter into any transaction on behalf of any trust"; (7) "make . . . any distribution required or permitted to be made to any beneficiary under any trust"; (8) "purchase any of the property . . . in the testamentary estate of the Grantor at its fair market value"; (9) "lend money to the testamentary estate of the Grantor"; (10) "make divisions or distributions in money or in kind . . . whenever required or permitted to divide or distribute all or any part of any trust"; (11) "invest the trust assets in any life insurance policy or policies"); (12) "release . . .  any fiduciary power" (13) "select and employ . . . any person, firm or corporation, engaged in rendering investment advisory services or investment management services . . ."; (14) "employ a bank or trust company . . . as custodian or agent"; (15) "invest all or any part of the trust assets in any common fund"; (16) "commence or defend . . . such litigation with respect to such trust or any property of such trust as the Trustee considers advisable"; and (17) "lend cash or property to any beneficiary".  Tr. Agr. §§ 4.1(a)-(q).  Notably, the Trust Agreement does not expressly authorize the trustee to file for bankruptcy protection for the Trust.

The Trust proffered the testimony of Ms. Douglass that the Trust was designed to "take property and vindicate it by way of use or sale."  Further, the Trust also proffered S. Preston Douglass' testimony that his step-grandfather, the Grantor, "engaged in business transactions through the Trust."  (Such self-serving testimony is flatly contradicted by the Trust Agreement which gives the Grantor no rights in the Trust or to operate the Trust.)  In any event, the Trust Agreement does not permit Ms. Douglass, as the sole beneficiary of the Trust, to transfer her interests in the Trust.  Also, there is no provision in the Trust Agreement for the issuance of shares or transferable certificates of participation.

## B.    Assets of the Trust.

The Trust initially was funded with $3,000.00.[34]  At some point (possibly in the 1980's), the Trust bought or received the Aspen Home as an asset.  Ms. Douglass, as co-trustee and sole beneficiary of the Trust, does not know who put the Aspen Home in the Trust or when.[35]  The Trust asserts that the current value of the Aspen Home is $13,000,000.00.[36]  In addition, the Trust maintains about $500,000.00 worth of artwork and antiques in the Aspen Home (although some artwork and antiques may belong to

---

[34]     Ex. 1 at 12.
[35]     Ex. 3 at 41.
[36]     Ex. 2 at 6.

Ms. Douglass personally).  The Trust has never rented the Aspen Home to generate income.  Ms. Douglass lives in the Aspen Home[37] but she does not pay rent to the Trust.  The Aspen Home has been marketed for sale continuously since 2017.[38] However, the Trust has not sold the Aspen Home.

In addition to the Aspen Home (and furnishings), the Trust identified only a few other assets with value: (1) a financial account at Plains Capital with $1,606.61; (2) a financial account at Union Bank of Switzerland with $2,979.27; and (3) "Rail Road Tank Cars" with an asserted current value of $300,000.00[39]

With respect to the railroad cars, someone (Ms. Douglass does not know who) purchased railroad cars and placed them into the Trust decades ago. [40]  Currently, the Trust owns seven railroad cars which are operable and leased for periods expiring after January 2024: GLNX 21043, GLNX 23141, GLNX 21004, GLNX 23115, GLNX 23116, GLNX 23117, and GLNX 34100.[41]  In addition to operable railroad cars, as of August 2023, the Trust also owned seven railroad cars which are inoperable and "need[] to be scrapped."[42]  Since then, two additional railroad cars have joined the "will be scrapped" list.[43]  The estimated scrap value of the Trust's railroad cars depends upon weight and varies between $5,491.00 to $9,063.00 per car.[44]  The "estimated scrap value" of all the nine inoperable railroad cars owned by the Trust is $63,341.00.[45]  Further, the "estimated scrap value" of all the seven operable railroad cars is $47,464.00.[46] The Court received no evidence why the Trust asserted that the railroad cars were worth $300,000.00 on Schedule A/B.

GNLX Corporation ("GNLX") is a railroad car leasing company and leases and manages the seven operable railroad cars for the Trust. [47]  For the quarter ended March 31, 2023, the Trust received net rentals from GNLX of $10,349.95 (which amount derived from leases of nine railroad cars).[48]  The monthly average rentals were $3,449.98 during such period.  Since then, one of the railroad car leases has expired and another is about to expire and such railroad cars will be scrapped.  So, the expected rental revenue will be less than it was when the Trust filed for bankruptcy.

---

[37]     Ex. 3 at 45-47.
[38]     Ex. 4 at 22-23.
[39]     Ex. 2 at 1-7.
[40]     Ex. 3 at 21-22 and 44; Ex. 4 at 11.
[41]     Ex. 6 (listing "active cars").  According to the proffered testimony of Ms. Douglass and S. Preston Douglass, Jr., the Trust has nine active and leased railroad cars.  However, with respect to GLNX 34112, the lease will expire on January 31, 2024 and the "car will be scrapped."  The lease for railroad car GLNX 34104 already expired (on October 31, 2023) and the "car will be scrapped."  *Id.*  Accordingly, the Court accepts that the Trust owns 7 operable railroad cars.
[42]     Ex. 6.
[43]     *Id.*
[44]     *Id.*
[45]     *Id.*
[46]     *Id.*
[47]     Ex. 4 at 12.
[48]     Ex. 5.

Nevertheless, the meagre railroad car rental and scrappage are the only sources of revenue for the Trust.

**C.      Operation of the Trust.**

As noted previously, Ms. Douglass and her step-son, S. Preston Douglass Jr., are the co-trustees of the Trust.  The Trust has no employees.[49]  It also has no physical office.  The Trust filed one Monthly Operating Report during the pendency of its bankruptcy case.[50]  During the one-month reporting period ended November 30, 2023, the Trust earned income of $0.00.

**D.      Debt Owed to the Secured Creditors.**

On July 25, 2008, the Trust borrowed $785,101.73 from Post Oak Bank, N.A. pursuant to a Promissory Note ("Note 1").[51]  Note 1 matured on July 25, 2013, and has not been repaid in full.  On July 21, 2009, the Trust borrowed $2,200,000.00 from Post Oak Bank, N.A. pursuant to a Promissory Note ("Note 2").[52]  Note 2 matured on January 21, 2011, and has not been repaid in full.  On September 30, 2015, the Trust borrowed $525,000.00 from Post Oak Bank, N.A. pursuant to a Promissory Note ("Note 3").[53] Note 3 matured on September 25, 2016, and has not been repaid in full.  Ms. Douglass, as the trustee of the Trust, executed Notes 1, 2 and 3 on behalf of the Trust.  One of the Secured Creditors, 42400 Highway 82 Acquisition, LLC, is the current holder of Notes 1, 2 and 3.  Notes 1, 2 and 3 are secured by deeds of trust on the Aspen Home.

On November 15, 2012, the Trust borrowed $1,225,000.00 from Diane and Charles Ofner pursuant to a Promissory Note ("Note 4").[54]  Note 4 matured on November 15, 2014, and has not been repaid in full.  Ms. Douglass, as the trustee of the Trust executed Note 4.  One of the Secured Creditors, 42400 Highway 82 Sub Debt, LLC, is the current holder of Note 4.  Note 4 is secured by a deed of trust on the Aspen Home.

The Trust has not made any payments to the Secured Creditors since about 2016.[55]  However, on February 21, 2020, the Trust and the Secured Creditors entered into a "Settlement and Forbearance Agreement" (the "Forbearance Agreement").[56]  In the Forbearance Agreement, the Trust agreed that the outstanding balance of principal, interest, and costs as of November 6, 2018, the petition date of the First Case, was:

Note 1:  $  727,275.83
Note 2:  $2,356,036.56

---

[49]      Ex. 3 at 33.
[50]      Docket No. 48.
[51]      Ex. 7.
[52]      Ex. 8.
[53]      Ex. 10.
[54]      Ex. 9.
[55]      Ex. 3 at 62.
[56]      Ex. 11.

Note 3:  $  595,227.37
Note 4: $1,607,531.04[57]

Through the Forbearance Agreement, the Trust agreed to sell the Property and pay the Secured Creditors on Notes 1, 2, 3 and 4 on or before September 15, 2020, failing which the Trust would transfer the Property to the Secured Creditors through a deed in lieu of foreclosure.[58]  The Trust executed the deed in lieu of foreclosure and placed it in escrow.[59]  The Forbearance Agreement led to the dismissal of the First Case.  However, the Trust did not sell the Property and the deed in lieu of foreclosure was not released to the Secured Creditors.[60]  So, the Secured Creditors commenced foreclosure proceedings against the Property.  Once again, the Trust filed for bankruptcy protection to stop the foreclosure process.  Post-bankruptcy, the Trust has indicated that it desires to sell the Property (which has been on the market for sale continuously since 2017).

## V.    Legal Analysis.[61]

## A.    Statutory Framework for Bankruptcy Eligibility.

The main issue in this dispute is whether the Trust is eligible to seek bankruptcy protection.  In reaching its decision, the Court starts with the applicable statutes.

### 1.    General Eligibility Requirements in All Bankruptcy Cases.

Section 109(a) sets forth the general requirements for "who may be a debtor" in all bankruptcy cases and states:

> Notwithstanding any other provision of this section, only a
> person that resides or has a domicile, a place of business, or

---

[57]    *Id.*
[58]    *Id.*
[59]    Ex. 12 and 13.
[60]    Ex. 17.
[61]    The Court relies upon and incorporates verbatim many passages from its recent decision on the same legal topic of trust eligibility for bankruptcy protection:  *In re Quadruple D Trust*, 639 B.R. 204 (Bankr. D. Colo. 2022).  For example, Section A "Statutory Framework for Bankruptcy Eligibility," Section B "The Meaning of the Statutory Term: 'Business Trust,'" Section C "Bankruptcy Caselaw Construing the Term 'Business Trust,'" and Section D "Legislative History Concerning the Term 'Business Trust'" (and most subparts) primarily restate the text of *Quadruple D Trust*, 639 B.R. 204 in respect of the applicable legal standards.  Nothing has changed with respect to the applicable legal standards since the issuance of the *Quadruple D Trust* decision and there is no need for the Court to "reinvent the wheel" on the topic. Given the wholesale restatement in Sections A, B, C, and D, the Court does not separately quote language from *Quadruple D. Trust*, 639 B.R. 204.  The Court also notes that both the Trust and the Secured Creditors relied on *Quadruple D Trust*, 639 B.R. 204 in the Motion to Dismiss, the Objection, and at closing argument during the Hearing.

   Notwithstanding, of course, all cases are unique.  So, in Section E "Application: the Trust is Not a 'Business Trust' and Its Bankruptcy Case Must Be Dismissed," the Court applies the applicable legal standards to the specific facts in this bankruptcy case and determines that the Trust is not a "business trust."

property in the United States, or a municipality, may be a debtor under this title [the Bankruptcy Code].

11 U.S.C. § 109(a).  So, at a minimum, only "a person" or a "municipality" may seek bankruptcy protection.  Section 101(41) defines the term "person":

The term "person" includes individual, partnership, and corporation, but does not include governmental unit . . . .

11 U.S.C. § 101(41).  The Trust seemingly acknowledges that it is not an individual or partnership.  Instead, the Trust presumably contends that it is a "corporation."  In bankruptcy vernacular, the term "corporation" is somewhat broader than the typical meaning under state law.  Section 101(9) provides:

The term "corporation" —

(A) includes —

(i) association having a power or privilege that a private corporation, but not an individual or a partnership possesses;

(ii) partnership association organized under a law that makes only the capital subscribed responsible for the debts of such association;

(iii) joint-stock company;

(iv) unincorporated company or association;

(v) business trust; but

(B) does not include limited partnership.

11 U.S.C. § 101(9).  The Trust claims that it is a "business trust"; but the Secured Creditors argue otherwise.  A "business trust" qualifies as a "corporation" under the Bankruptcy Code and is eligible generally to seek bankruptcy protection.  *See In re Sung Soo Rim Irrevocable Intervivos Tr.*, 177 B.R. 673, 675 (Bankr. C.D. Cal. 1995) ("'Business trusts,' however, may file bankruptcy petitions."); *Cutler v. 65 Security Plan*, 831 F. Supp. 1008, 1014 (E.D.N.Y. 1993) ("'Business trusts' can be debtors in bankruptcy.  Such trusts are eligible because Congress recognized their similarity to corporations.").  On the other hand, a trust that is not a "business trust" generally is not eligible to file for bankruptcy protection.  *Cath. Sch. Emp. Pension Tr. v. Abreu (In re Cath. Sch. Emp. Pension Tr.),* 599 B.R. 634, 652 (1st Cir. BAP 2019) ("Thus, for a trust to be eligible to file a bankruptcy petition, it 'must qualify as a business trust.'  Conversely, '[i]f the debtor [trust] is not a business trust, then it is not eligible to file a

12

bankruptcy petition.'"). Accordingly, this dispute requires the Court to consider whether the Trust is a "business trust."

**2.      The Trust Bears the Burden to Prove Bankruptcy Eligibility.**

The Trust bears the burden to prove its eligibility to file for bankruptcy protection. *See First Nat'l Bank of Durango v. Woods (In re Woods)*, 743 F.3d 689, 705 (10th Cir. 2014) ("Debtors had the burden of establishing their eligibility for Chapter 12 relief."); *Hamilton Creek Metro. Dist. v. Bondholders Colo. Bondshares (In re Hamilton Creek Metro. Dist.)*, 143 F.3d 1381, 1384-85 (10th Cir. 1998) (debtor bears burden to show eligibility under Chapter 9 of Bankruptcy Code).; *In re Ikalowych*, 629 B.R. 261, 275 (Bankr. D. Colo. 2021) (debtor bears burden to prove eligibility in Chapter 11 Subchapter V case); *In re Sullivan*, 626 B.R. 326, 330 (Bankr. D. Colo. 2021) ("The Debtor bears the burden to demonstrate satisfaction of the eligibility requirements for subchapter V.").

**B.      The Meaning of the Statutory Term: "Business Trust."**

**1.      General Guidelines for Statutory Interpretation.**

The key to this case is the meaning of the term "business trust" as used in Section 101(9) of the Bankruptcy Code. Congress did not expressly define the phrase "business trust" when it enacted the Bankruptcy Code. That is not particularly unusual. After all, the Bankruptcy Code does not contain a definition of every word and phrase used in the legislation. Accordingly, to ascertain the meaning of the phrase "business trust" (and thus, the Trust's eligibility to file for bankruptcy protection) the Court must engage in a classic federal statutory interpretation exercise.

Since the Bankruptcy Code "standardizes an expansive (and sometimes unruly) area of law," it is the Court's "obligation to interpret the Code clearly and predictably using well established principles of statutory construction." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012). The Court employs a fair reading method that dictates the primacy of the "language of the statute itself." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (quoting *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).

Timing-wise, statutory interpretation should focus on the meaning of the statutory text at the time of original enactment. *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 128 n.2 (2015) (interpreting the word "services" as of 1934 when the term was first used in the bankruptcy statute). Put another way, "[t]o gain a proper understanding of the statute at issue, we must put it into its historical context." *Aulston v. U.S.*, 915 F.2d 584, 585 (10th Cir. 1990). In this case, as explained below, the term "business trust" was first employed as part of the definition of "corporation" when the Bankruptcy Code was originally enacted in 1978. Pub. L. 95-598, 92 Stat. 2549 (Nov. 6, 1978). So, the Court need only look back four decades. *See Field v. Mans,* 516 U.S. 59 , 70 (1995)

(stating that "we will look to the concept of 'actual fraud' as it was understood in 1978 when that language was added to [the Bankruptcy Code]").

Typically, the starting place for statutory interpretation is the "plain" or "ordinary" meaning of the text.  *Clark v. Rameker*, 573 U.S. 122, 127(2014); *Hamilton v. Lanning*, 560 U.S. 505, 513 (2010).  As the Supreme Court explained, "[w]hen terms used in a statute are undefined, we give them their ordinary meaning."  *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995); *see also Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018) ("Because the Bankruptcy Code does not define the words 'statement,' 'financial condition,' or 'respecting,' we look to their ordinary meanings.")  The "plain" or "ordinary" meaning approach also has been characterized as "fair reading."  Under the "fair-reading" method, the exercise is to determine:

> how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued. The endeavor requires aptitude in language, sound judgment, the suppression of personal preferences regarding the outcome, and, with older texts, historical linguistic research.  It also requires an ability to comprehend the *purpose* of the text . . . .

Antonin Scalia and Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 33 (Thompson/West 2012) [hereinafter, "READING LAW at ___"] (emphasis in original).  The Court will construe the term "business trust" under the "fair reading" method of statutory interpretation as a matter of federal law.  However, the Court diverts for a moment to address the role of state law.

    **2.**    <u>Interpretation of Terminology in the Bankruptcy Code Is a Matter of Federal Statutory Interpretation and Is Not Governed by Federal Common Law or State (or Foreign) Law</u>.

Congress enacted the Bankruptcy Code.  It is a federal law.  Section 101(9) contains the phrase "business trust."  And, the Court must decide whether the Trust is eligible to seek protection as a "business trust" under the Bankruptcy Code.  So, it may seem obvious that the Court must apply federal law and standard principles of statutory interpretation when deciding what the term "business trust" means.  *Appling*, 138 S. Ct. at 1759 (engaging in classic statutory interpretation exercise to determine meaning of three words and phrases in Bankruptcy Code); *Baker Botts*, 576 U.S. at 128-29 (applying ordinary rules of statutory interpretation to word "services" in Bankruptcy Code); *Bullock v. Bankchampaign, N.A.*, 133 S. Ct. 1754 569 U.S. 267 (2013) (construing word "defalcation" in Bankruptcy Code without suggesting that state law governs); *RadLAX*, 566 U.S. at 649 ("[I]t is our obligation to interpret the [Bankruptcy] Code clearly and predictably using well established principles of statutory construction.").

14

However, some bankruptcy courts have elected to employ a different approach whereby the phrase "business trust" is governed exclusively by state or foreign law.  For example, *In re EHT US1, Inc.*, 630 B.R. 410 (Bankr. D. Del. 2021), the bankruptcy court observed:

> There is a split of authority as to whether the law of the jurisdiction in which the trust resides or federal common law governs [the determination of whether a trust is eligible to file for bankruptcy as a "business trust" under Section 101(9)]. That said, the weight of authority falls in favor of applying federal common law.  The Court disagrees with this authority.

*Id.* at 423; *see also* Katherine M. Fix and Ryan M. Messina, *Does Federal Common Law Define a Business Trust's Eligibility for Chapter 11?,* 40 AM. BANKR. INST. J. 22 (Oct. 2021) (seeming to endorse *EHT* case as a "new standard" rejecting "federal common law" under Section 101(9)).

The *ENT* decision is, by its own admission, a real outlier:  one of only a handful of bankruptcy decisions in the last four decades eschewing federal law in deciding bankruptcy eligibility and instead endorsing state or foreign law.  *See also In re Heritage N. Dunlap Tr.*, 120 B.R. 252, 254 (Bankr. D. Mass. 1990) ("Since the [Bankruptcy] Code does not define what constitutes a business trust, we look to state law.").  However, since it is a recent case on the topic, the Court has carefully considered its analysis and holding.  In *ENT*, a Singapore trust filed for protection under Chapter 11 of the Bankruptcy Code.  Faced with a motion to dismiss for lack of eligibility, the *ENT* bankruptcy court started out with the right question:  "The core issue is whether a Singapore [trust] . . . is a 'business trust' that is eligible to be a 'debtor' under the Bankruptcy Code."  *Id.* 414.

But instead of construing the meaning of the term "business trust," the *ENT* court diverted to what it called "first principles" and *Butner v. U.S.*, 440 U.S. 48 (1979), noting: "one of the foundational principles of bankruptcy law is that it changes non-bankruptcy law only when the purposes of bankruptcy require it."  *ENT*, 630 B.R. at 423.  The references to "first principles" and *Butner* are puzzling since they deal with substantive law, not procedural issues such as eligibility to file for bankruptcy protection.  In *Butner*, the Supreme Court was not faced with interpreting the meaning of a word or phrase in the Bankruptcy Code.  Instead, *Butner* centered on "a dispute between a bankruptcy trustee and a second mortgagee over the right to the rents collected during the period between the mortgagor's bankruptcy and the foreclosure sale of the mortgaged property."  440 U.S. at 50.  The Bankruptcy Code contains no provisions governing the topic.  And, the legal question was "whether the right to such rents is determined by a federal rule of equity or by the law of the State where the property is located."  *Id*.  The classic *Butner* holding is:

> Property interests are created and defined by state law.
> Unless some other federal interest requires a different result,
> there is no reason why such interests should be analyzed
> differently simply because an interested party is involved in a
> bankruptcy proceeding.

440 U.S. at 55.  Although the *Butner* decision is very important in the context of
substantive property rights, it has nothing to do with deciding the meaning of a specific
phrase (such as "business trust") enacted by Congress in the Bankruptcy Code.  One
appellate court put it this way:

> [S]ome lower federal courts have looked to state law for the
> definition of "business trust," but we find those cases
> unpersuasive:  they either do not explain their reasoning or
> cite to the case of *Butner v. U.S.* . . . as if that case provided
> the last word . . . .  The connection between *Butner* and the
> "business trust" question is by no means plain however —
> particularly because *Butner* dealt with substantive property
> rights, whereas here the question is one of procedure,
> regarding whether the Trust has standing to file a bankruptcy
> case . . . .  We conclude that *Butner* does not control, and
> that the definition of "business trust" properly belongs to
> federal, rather than state, law.

*Brady-Morris v. Schilling (In re Kenneth Allen Knight Tr.)*, 303 F.3d 671, 678-79 (6th Cir.
2002) [hereinafter, *Knight Trust II*]  (citations omitted).

In any event, after the "first principles" and *Butner* discussion, the *ENT* court took
a wild trip around the world and held:

> [T]he Court finds that federal common law should not
> determine whether a trust is a "business trust" under the
> Bankruptcy Code.  Rather, the law of the jurisdiction in which
> the trust is organized, in this case the Republic of Singapore,
> shall govern . . . .  [T]he court shall now turn to whether [the
> Singapore trust] is a business trust under Singapore law.

*EHT*, 630 B.R. at 425.  And, then, the *EHT* court embarked on its own assessment
(aided by dueling foreign law experts) of whether the trust was "a business trust under
Singapore law," ultimately concluding that the trust was "a business trust under
Singapore law and, thus, an eligible debtor under the Bankruptcy Code."  *Id*. at 428.

The Court respectfully disagrees with the *EHT* holding and cases like it.  First,
the *EHT* court's reference to "federal common law" as the alternative to Singapore law
is misplaced.  Determining the meaning of a term in the Bankruptcy Code (such as
"business trust") is an exercise in which bankruptcy judges engage every day.  The task

16

is called statutory interpretation.  It is not the creation of federal common law.  Federal common law is "a rule of decision that amounts, *not simply to an interpretation of a federal statute* or a promulgated administrative rule, but, rather, to the judicial 'creation' of a special federal rule of decision."  *Atherton v. F.D.I.C.*, 519 U.S. 213, 218 (1997) (emphasis added); *see also Rodriguez v. F.D.I.C.*, 140 S. Ct. 713, 717 (2020) (confirming that "federal common law" is "judicial lawmaking" and only limited areas exist in which federal judges may appropriately craft the rule of decision").

Deciding whether the Trust is a "business trust" under Section 101(9) does not require the Court to create a new substantive federal rule of decision or engage in "judicial lawmaking."  Instead of creating new "federal common law," the Court is called upon only to construe a phrase expressly used by Congress in the part of the Bankruptcy Code which sets forth the procedural requirements for bankruptcy eligibility.  *See*, *e.g.*, *Northwest Airlines, Inc. v. Transp. Workers Union*, 451 U.S. 77, 97 (1981) ("But the authority to construe a statute is fundamentally different from the authority to fashion a new rule or to provide a new remedy which Congress has decided not to adopt."); *U.S. v. Gen. Battery Corp.*, 423 F.3d 294, 304 (3d Cir. 2005) ("[T]he 'creation' of federal common law must be distinguished from statutory interpretation. . . . Ambiguous federal statutes generally do not authorize the creation of a new . . . body of federal law."); *Jansen v. Packaging Corp.*, 123 F.3d 490, 507 (7th Cir. 1997) (concurrence noted uniform interpretation of an undefined term in a federal statute "is not free-wheeling common-law rulemaking").

A second problem with exclusive reliance on state (or foreign) law is that such approach simply ignores the obligation of bankruptcy courts to interpret a federal statute.  *RadLAX*, 566 U.S. at 649 ("[I] t is our obligation to interpret the [Bankruptcy] Code clearly and predictably using well established principles of statutory construction.").  Instead of construing the meaning of the words in the Bankruptcy Code, the *EHT* court apparently decided to use another body of law in place of what Congress wrote.  But why should Singaporean (or for that matter Mongolian or Tanzanian) law dictate which entities are eligible for federal bankruptcy protection in the United States?  Phrasing it that way makes the answer fairly obvious:  foreign law cannot dictate the result.  In any event, the *EHT* decision simply does not explain why the vagaries of state or foreign law should supplant Congress' words.

A third issue with the *EHT* result is the dearth of legal support for avoiding statutory interpretation of the text of the Bankruptcy Code (*i.e.*, the term "business trust").  The *EHT* bankruptcy court reasoned as follows:

> [1] There is no federal law that creates business entities.  [2] Thus, in determining whether an entity such as a trust has the capacity to take specific legal action one should look in the first instance to the state law under which the entity exists.  [3] This same principle should apply to determining whether a trust . . . is a "business trust" that is eligible to be a debtor under the Bankruptcy Code . . . .

*EHT*, 630 B.R. at 424 (numbering added).  The first two points clearly are correct.  But, the third point logically does not follow, and is unsupported by any citation to case law or other authority.   The mere fact that federal courts look to state law to assess entity governance issues in no way suggests that the meaning of the phrase "business trust" must be found only in state (or foreign) law.  Instead, Congress utilized the term to describe, as a matter of federal law, the type of entity which may file for bankruptcy.

And there are more problems still with relying exclusively on state (or foreign law) to decide bankruptcy eligibility.  Such an approach would destroy uniformity.[62]  As another bankruptcy court noted:

> Whether an entity is eligible for relief under title 11 of the United States Code is purely a matter of federal law.  To hold otherwise would result in different results in different states and an entity would be eligible for relief in one state but not another.  Clearly, this is not what Congress intended when it enacted the bankruptcy laws in this country in conformity with the mandate of Article I, § 8, Cl. 4 of the Constitution, which provides that "Congress shall have the power . . . to establish . . . uniform laws on the subject of bankruptcies."

*In re Arehart*, 52 B.R. 308, 310-11 (Bankr. M.D. Fla. 1985).  Just so.

Ultimately, the Court concludes that it must employ standard principles of statutory interpretation to construe the federal law term "business trust" under the Bankruptcy Code.  *Knight Tr. II*, 303 F.3d at 679 ("the definition of 'business trust' properly belongs to federal, rather than state, law"); *Cath. Sch. Emp. Pension Tr.,* 599 B.R. at 654 ("there is a consensus that federal law should govern the determination of [bankruptcy] eligibility for trusts."); *In re Blanche Zwerdling Revocable Living Tr.*, 531 B.R. 537, 543 (Bankr. D.N.J. 2015) ("what constitutes a business trust for bankruptcy purposes is a matter of federal law").  Neither state nor foreign law is dispositive on the issue.[63]  Having completed a diversion into analyzing contrary approaches, the Court turns back to the task at hand: a fair reading of the text of Section 101(9).

---

[62]    The *EHT* court asserted that "the precept that applying federal common law to determine whether a trust is a business trust will promote uniformity has proved to be false."  *EHT*, 630 B.R. at 425. That rationale is wrong.  Admittedly, bankruptcy courts so far have not always interpreted the phrase "business trust" under Section 101(9) the same way.  However, bankruptcy uniformity may be achieved (in this area and all the many other areas in which bankruptcy courts have differing opinions) through iterative trial level decisions and appeals to the respective Courts of Appeals and/or the Supreme Court.  Resorting to state (or foreign) law to resolve bankruptcy eligibility issues surely is the way to destroy uniformity in the bankruptcy system.

[63]    To say that state law is not dispositive does not suggest that state law is irrelevant.  Instead, to the extent that state law might shed light on the meaning of the term "business trust" as used in 1978, such state law might assist in the interpretive enterprise.  And, the Court does examine state statutes later as a source of meaning for the term "business trust."  Furthermore, in this case, Texas law also has some important implications with respect to the purpose for which the Trust was created.

**3.      The Meaning of the Term "Business Trust" Under the Fair Reading Method.**

        As already noted, Congress did not separately define the phrase "business trust" used in the Bankruptcy Code.  So, the Court must look elsewhere for meaning.  The Court concludes that there are many useful guideposts for ascertaining the meaning of the term "business trust" in 1978 including:  federal case law; dictionaries; legal articles; treatises; reports; and state statutes.  All of such sources point in the same direction. However, before examining such sources, a few observations are in order.

        In this case, the Court is called upon to interpret a two-word phrase: "business trust."  From a lexicographical point of view, the word "business" (used as an adjective or a noun) means "commercial or mercantile activity customarily engaged in as a means of livelihood."  WEBSTER'S THIRD NEW INT'L DICTIONARY 302 (G. & C. Merriam Co. 1968). Put another way, "business" means "the activity of buying and selling commodities, products, or services" or "a specific occupation or pursuit."  AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 252 (Houghton Mifflin Harcourt 5th ed. 2011); *see also* Henry Campbell Black, BLACK'S LAW DICTIONARY: DEFINITIONS OF THE TERMS AND PHRASES OF AMERICAN AND ENGLISH JURISPRUDENCE, ANCIENT AND MODERN 179 (West. Pub. Co. 5th ed. 1979) [hereinafter, "BLACK'S LAW 5th Ed. at ___."] ("business" means "[a]ctivity or enterprise for gain, benefit, advantage or livelihood").  The word "business" is not really technical in nature.  Native English-speakers generally understand the word to have the foregoing meanings.

        On the other hand, the noun "trust" is far more technical and refers to a specialized sort of legal relationship.  For the public at large, a "trust" merely conjures up images of a "trust fund" and the thought that wealthy people use trusts in some mysterious way to hide their wealth from creditors and avoid paying taxes.  Maybe that is not so far off the mark.  But, it can hardly be doubted that the word "trust" has special legal meaning.  *See*, *e.g.*, BLACK'S LAW 5th Ed. at 179 (trust means "[a] right of property, real or personal, held by one party for the benefit of another", and "a fiduciary relation with respect to property, subjecting the person by whom the property is held to equitable duties to deal with the property for the benefit of another person . . . ."); RESTATEMENT (SECOND) OF TRUSTS (ALI 1959) ("A trust . . . is a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it.").

        While considering the constituent parts of the phrase at issue — "business" and "trust" — might have some relevance, merely stringing the words together is not enough and could lead in the wrong direction.  Instead, the entire phrase ("business trust") must be considered as a single unit in the special context of the Bankruptcy Code. "[S]ometimes context indicates that a technical meaning applies."  READING LAW at 73. In their seminal treatise on statutory interpretation, Justice Scalia and Bryan Gardner explained:

> Every field of serious endeavor develops its own
> nomenclature — sometimes referred to as *terms of art*.
> Where the text is addressing a scientific or technical subject,
> a specialized meaning is to be expected.  "In terms of art
> which are above the comprehension of the general bulk of
> mankind, recourse, for explanation, must be had to those,
> who are most experienced in that art."  And when the law is
> the subject, ordinary legal meaning is to be expected, which
> often differs from common meaning.  As Justice Frankfurter
> eloquently expressed it: "[I]f a word is obviously transplanted
> from another legal source, whether the common law or other
> legislation, it brings the old soil with it."

*Id*. (emphasis in original) (quoting Hugo Grotius, THE RIGHTS OF WAR AND PEACE 177
(1625; A.C. CAMPBELL trans. 1901); and Felix Frankfurter, *Some Reflections on the
Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)).

Having considered the issue, the Court has reached the conclusion that the term
"business trust" does not have a plain or ordinary meaning well understood by the
American public writ large.  Instead, the phrase is a specialized form of legal
terminology which has been transplanted into the Bankruptcy Code.  Since it is a
technical legal term, its meaning must be derived mainly from legal sources during the
relevant time period (*i.e.,* on or before 1978 when the Bankruptcy Code became law).
Fortunately, such legal sources abound and are very consistent in providing the legal
meaning of the phrase "business trust."

###### a.   Use of the Term "Business Trust" in Federal Case Law Before Enactment of the Bankruptcy Code.

There is no precedent from the Supreme Court or the Tenth Circuit construing
the phrase "business trust" specifically in the context of Section 101(9) of the
Bankruptcy Code.  However, the Supreme Court has explained the meaning of the term
"business trust" as a general matter on multiple occasions.  The history is revealing.

Analysis of the phrase "business trust" in federal case law confirms that the term
initially came in vogue shortly after it started appearing in legal articles and books in the
first third of the twentieth century.  The first reported federal judicial decision utilizing the
term "business trust" is *Little Four Oil & Gas Co. v. Lewellyn*, 35 F.2d 149 (3d Cir.
1929).  In *Lewellyn* (a key and oft-cited decision on the topic of "business trusts"), the
appellate panel drew a clear distinction between two classes of trusts:

> One, where the trustees merely collect dividends or interest,
> or rentals, and distribute them among the shareholders — a
> simple common law trust similar in legal effect and in
> exemption from certain taxation to a trust under a will where

> the trustee merely collects income and distributes it among
> beneficiaries; *the other, where a trust is organized or
> declared for business purposes and the trustees carry on an
> active business for profit, regarded as a plain unincorporated
> joint-stock association and liable for taxes at the corporation
> rate*.

*Id*. at 150 (emphasis added).  Regarding the second type of trust, the appellate court declared:

> The real test is whether the shareholders or trustees, or both
> combined, carry on business for profit, and, if they do, they
> constitute a *business trust* — in legal effect an association or
> a joint-stock company — with liability for taxes.

*Id.* (emphasis added).

Although *Lewellyn* was the first reported federal opinion to use the term "business trust," the *Lewellyn* appellate panel relied on an earlier Supreme Court decision, *Hecht v. Malley*, 265 U.S. 144, 146-47 (1924), characterizing a "Massachusetts Trust" as

> a form of business organization, common in that State,
> consisting essentially of an arrangement whereby property is
> conveyed to trustees, in accordance with the terms of an
> instrument of trust, to be held and managed for the benefit of
> such persons as may from time to time be the holders of
> transferable certificates issued by the trustees showing the
> shares into which the beneficial interest in the property is
> divided.

*Hecht*, 265 U.S. at 146-47 (footnote omitted) (deciding three Massachusetts trusts were "associations" for tax purposes because of their "quasi-corporate organizations under which they engaged in carrying on business enterprises).  Effectively, the *Lewellyn* appellate court simply used the phrase "business trust" as a new shorthand for the longer and more detailed description of the Massachusetts trust in *Hecht*, 265 U.S. at 146-47.  Decades later, Justice Blackmun (in a dissent) characterized the *Hecht* formulation as "the classic definition" of the "Massachusetts business trust."  *Navarro Savings Assoc. v. Lee*, 446 U.S. 458, 467-68 (1980).

As we shall see, these early federal judicial decisions are consistent, to a remarkable degree, with the definitions in legal dictionaries, legal periodicals, treatises, law reports, and state statutes.  In any event, the Supreme Court issued the seminal decision on "business trusts" a decade later in the context of a tax dispute:  *Morrissey v. Comm'r of Internal Revenue*, 296 U.S. 344 (1935).  The Supreme Court first identified the purpose of "business trusts":

> In what are called "business trusts" the object is not to hold
> and conserve particular property, with incidental powers, as
> in the traditional type of trusts, but to provide a medium for
> the conduct of a business and sharing its gains.  Thus a trust
> may be created as a convenient method by which persons
> become associated for dealings in real estate, the
> development of tracts of land, the construction of
> improvements, and the purchase, management, and sale of
> properties; or for dealings in securities or other personal
> property; or for the production, or manufacture, and sale of
> commodities; or for commerce, or other sorts of business;
> where those who become beneficially interested, either by
> joining in the plan at the outset, or by later participation
> according to the terms of the arrangement, seek to share the
> advantages of a union of their interests in the common
> enterprise.

*Id*. at 357.  And, then, the Supreme Court identified the attributes of "business trusts" by
reference to corporations:

> What, then, are the salient features of a trust — when
> created and maintained as a medium for the carrying on of a
> business enterprise and sharing its gains — which may be
> regarded as making it analogous to a corporate
> organization?  A corporation, as an entity, holds the title to
> the property embarked in the corporate undertaking.
> Trustees, as a continuing body with provision for succession,
> may afford a corresponding advantage during the existence
> of the trust.  Corporate organization furnishes the opportunity
> for a centralized management through representatives of the
> members of the corporation.  The designation of trustees,
> who are charged with the conduct of an enterprise, who act
> "in much the same manner as directors," may provide a
> similar scheme, with corresponding effectiveness.  Whether
> the trustees are named in the trust instrument with power to
> select successors, so as to constitute a self-perpetuating
> body, or are selected by, or with the advice of, those
> beneficially interested in the undertaking, centralization of
> management analogous to that of corporate activities may
> be achieved.  An enterprise carried on by means of a trust
> may be secure from termination or interruption by the death
> of owners of beneficial interests and in this respect their
> interests are distinguished from those of partners and are
> akin to the interests of members of a corporation.  And the
> trust type of organization facilitates, as does corporate

22

> organization, the transfer of beneficial interests without
> affecting the continuity of the enterprise, and also the
> introduction of large numbers of participants.  The trust
> method also permits the limitation of personal liability of
> participants to the property embarked in the undertaking.

*Id*. at 359.

In the Court's view, the *Hecht* and *Morrissey* decisions are binding appellate precedent and virtually dispositive of the meaning of the phrase "business trust" during the middle of the twentieth century not long before the Bankruptcy Code was enacted. *See Navarro*, 446 U.S. at 467-68 (as noted in dissent, *Hecht* opinion presented the "classic definition" of the "Massachusetts business trust"); *Barboza v. Cal. Ass'n of Prof. Firefighters*, 799 F.3d 1257, 1265  n.3 (9th Cir. 2015) (citing *Hecht* case for proposition that "a business or Massachusetts Trust is a form of business organization similar to a corporation."); 16A FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 8228 (Thompson Reuters Supp. 2021) (referring to *Hecht* decision as "classic definition" for section of treatise titled: "Definition and nature of business trusts").  Just a decade before enactment of the Bankruptcy Code, a Colorado federal court confirmed that the "Massachusetts trust" and the "business trust" were synonymous and then relied on the *Morrissey* holding for the proposition that "[t]he difference between an association or business trust and an ordinary trust is so well established that it hardly needs to be documented . . . ."  *Rippey v. Denver U.S. Nat'l Bank*, 260 F. Supp. 704, 714 (D. Colo. 1966).  In other words, there really was no jurisprudential doubt about the meaning of the term "business trust" when the Bankruptcy Code was enacted.

Although the *Hecht* and *Morrissey* decisions were issued to decide tax disputes, nothing about the opinions limits their operation to that area of the law.  *See Massachusetts or Business Trust,* 156 A.L.R. 27 (Lawyers Co-Operative Pub. Co. 1945) (referring to *Hecht* decision in general definition of "business trust").  Instead, the Supreme Court definitively defined the phrase "business trust" and then, based on the meaning of "business trust," simply applied the term in the context of a tax dispute.  The *Hecht* and *Morrissey* definitions of "business trusts" often have been applied outside the area of taxation.  *See Navarro*, 446 U.S. at 467-68 (dissent cited *Hecht* opinion as the "classic definition" of the "Massachusetts business trust" in federal diversity jurisdiction dispute); *Nat'l City Bank v. Fidelco Growth Inv.*, 446 F. Supp. 124, 127 n.3 (E.D. Penn. 1978) (relying on both *Hecht* and *Morrissey* decisions as dispositive definitions of "business trust" in federal diversity jurisdiction dispute, dismissing characterization of *Morrissey* as "an old tax decision" and concluding that "the *Morrissey* analysis is no less pertinent to this case [a non-tax dispute] for having been enunciated in 'an old tax decision'"); *Carey v. U.S. Indus., Inc.*, 414 F. Supp. 794, 795 (N.D. Ill. 1976) (citing *Morrissey* case in a dispute involving federal diversity jurisdiction and explaining that "the business trust closely resembles a corporation in its centralized control, limited liability, profit motivation, and free transfer of the beneficial interest"); *Rippey*, 260 F. Supp. at 714 (relying on *Morrissey* definition of "business trust" in securities dispute).  In the Court's view, nothing about the purpose of the Bankruptcy Code (and its eligibility

provisions) suggests that some alternative and different definition should be used in the bankruptcy context.[64]

---

[64]     *But see Knight Tr. II*, 303 F.3d at 679.  In *Knight Trust II*, an appellate court declined to utilize the *Morrissey* definition of the term "business trust" when construing the Bankruptcy Code stating:

> [S]ome courts have continued to require transferable certificates of ownership [as a prerequisite for a "business trust"], relying on *Morrissey* . . . in which the Supreme Court set out the test for when trusts may be treated as corporations under the Internal Revenue Code — a test requiring, inter alia, transferable certificates of ownership.  Though [certain parties] urge us to follow *Morrissey*, we decline to do so: the *Morrissey* criteria were meant for the Internal Revenue Code, and they contradict the 1978 liberalization of the Bankruptcy Code's treatment of business trusts . . . .

*Id*.  The Court respectfully disagrees with the foregoing holding in *Knight Trust II* for several reasons.  *First*, in the Court's view, the *Morrissey* decision did not "set out the test for when trusts may be treated as corporations under the Internal Revenue Code."  Instead, the question was whether a particular type of trust was an "association."  *Morrissey*, 296 U.S. at 359 ("[W]e are of the opinion that the trust constituted an association.").  In order to answer that question, the Supreme Court identified two types of trusts: (1) "an ordinary trust . . . by which particular property is conveyed to a trustee . . . for the benefit of the named or described person"; and (2) "what are called 'business trusts.'"  *Id*. at 356-360.  And, then, the Supreme Court defined the attributes of a "business trust" generally (not in relation only to tax law).  After defining the general characteristics of a "business trust," the Supreme Court turned to the specific features of the petitioner trust and decided that the entity was an "association."  *Id*. at 356-60.  *Second,* the Supreme Court did not create "a test" requiring, inter alia, transferable certificates of ownership.  Instead, when describing the characteristics of a "business trust," the Supreme Court merely noted that "the [business] trust type of organization facilitates, as does corporate organization, the transfer of beneficial interests without affecting the continuity of the enterprise . . . ." *Id*. at 359.  So, transferability of interests was identified as a typical feature of a "business trust."  *Third*, the Court disagrees with the conclusion that "the *Morrisey* criteria were meant for the Internal Revenue Code."  Nothing in the *Morrissey* case indicates that the definition of a "business trust" (which it described in a generic fashion) was limited to tax cases.  In other words, the Supreme Court never suggested that there are two (or more) definitions of "business trust" – one to be used in tax cases; and another different definition of "business trust" to be used in non-tax cases.  And, of course, that would make no sense at all.  Instead, the *Morrissey* definition of the phrase "business trust" is extremely similar to the definitions used in dictionaries, law journal articles, treatises, reports, state statutes, and other sources to describe the meaning of the term "business trust" generally.  *Fourth*, the *Knight Trust II* appellate panel ignored significant precedent applying the *Hecht* and *Morrissey* definitions outside of the area of taxation.  *Fifth*, the Court disagrees with the premise that the *Morrissey* definition of the phrase "business trust" "contradict[s] the 1978 liberalization of the Bankruptcy Code's treatment of business trusts."  As will be explained in more detail later, the term "business trust" was first used in the Bankruptcy Code in 1978.  There is no contradiction.  And, *sixth*, by rejecting the commonly-accepted *Morrissey* definition of the phrase "business trust," the *Knight Trust II* appellate court put itself into the unenviable position of having to make up a new definition of "business trust" out of whole cloth rather than just using the plain and ordinary legal meaning of the term at the time of enactment of the Bankruptcy Code.  Such an approach is contrary to binding Supreme Court precedent on statutory interpretation.  *See Field,* 116 S. Ct. at 443 (construing phrase added to Bankruptcy Code in 1978; " we will look to the concept of 'actual fraud' as it was understood in 1978 when that language was added to [the Bankruptcy Code]").  Ultimately, the Court concludes that the attributes of a "business trust" listed in *Hecht* and *Morrissey* are key.

24

b.  **Legal Dictionary Definitions of the Term "Business Trust" Before Enactment of the Bankruptcy Code.**

According to the Supreme Court, dictionaries (although not dispositive) can help determine the ordinary meaning of words and phrases contained in the Bankruptcy Code. *City of Chicago, Illinois v. Fulton*, 141 S. Ct. 585, 590 (2021) (using dictionaries to define words "act" and "exercise" in Bankruptcy Code); *Appling*, 138 S. Ct. at 1759 (using dictionaries to define words "statement" and "respecting" in Bankruptcy Code); *Baker Botts,* 576 U.S. at 121, 128 (using dictionaries to define word "services" in Bankruptcy Code); *Clark*, 573 U.S. at 127 (using dictionaries to define words "retirement" and "funds" in Bankruptcy Code); *Ransom*, 562 U.S. at 69 (using dictionaries to define word "applicable" in Bankruptcy Code). According to the most influential treatise on statutory interpretation, when trying to ascertain the meaning of a word or phrase "we should consult (without apology) what the lexicographers say." READING LAW at 36.

A lexicographical review demonstrates that the term "business trust" was not in common legal usage until after approximately the first third of the twentieth century. *See* Robert C. Brown, *Common Law Trusts as Business Enterprises*, 3 INDIANA L. J. 595 (May 1928) (proposing that phrase "'business trust' would be more desirable" in reference to business enterprises operating through trusts); Michael L. Weissman, *The Common Law of Business Trusts,* 38 CHICAGO-KENT LAW REV. 12 (April 1961) ("Business trusts gained prominence in the 1920's . . . ."). For example, the following principal legal dictionaries[65] in use between 1871 and 1934 contain no reference to the phrase "business trust" at all:  John Bouvier, BOUVIER'S LAW DICTIONARY (Banks-Baldwin Law Pub. Co. 1934); Benjamin W. Pope, LEGAL DEFINITIONS, A COLLECTION OF WORDS AND PHRASES AS APPLIED AND DEFINED BY THE COURTS, LEXICOGRAPHERS AND AUTHORS OF BOOKS ON LEGAL SUBJECTS (Callaghan & Co. 1919); James A. Ballentine, LAW DICTIONARY OF WORDS, TERMS, ABBREVIATIONS AND PHRASES WHICH ARE PECULIAR TO THE LAW AND THOSE WHICH HAVE A PECULIAR MEANING IN THE LAW (Bobbs-Merrill Co. Pub. 1916); John Bouvier, BOUVIER'S LAW DICTIONARY AND CONCISE ENCYCLOPEDIA (West. Pub. 8th ed. 1914); Henry Campbell Black, A DICTIONARY OF LAW CONTAINING DEFINITIONS OF THE TERMS AND PHRASES OF AMERICAN AND ENGLISH JURISPRUDENCE, ANCIENT AND MODERN (West. Pub. Co. 2d ed. 1910); Henry Campbell Black, A DICTIONARY OF LAW CONTAINING DEFINITIONS OF THE TERMS AND PHRASES OF AMERICAN AND ENGLISH JURISPRUDENCE, ANCIENT AND MODERN (West. Pub. Co. 1st ed. 1891); John Bouvier, LAW DICTIONARY ADAPTED TO THE CONSTITUTION AND LAWS OF THE UNITED STATES (George W. Childs Pub. 14th ed. 1871).

In 1933, the most prominent American legal lexicographer (Henry Campbell Black) added a first cursory definition of "business trust" to his famous dictionary, stating:  "As distinguished from a joint-stock company, a pure 'business trust' is one in which the managers are principals, and the shareholders are cestuis que trust." Henry Campbell Black, A DICTIONARY OF LAW CONTAINING DEFINITIONS OF THE TERMS AND

[65]      *See* READING LAW at  419-23 (listing the "most useful and authoritative" legal dictionaries to "reflect meanings current at a given time").

PHRASES OF AMERICAN AND ENGLISH JURISPRUDENCE, ANCIENT AND MODERN 261 (West. Pub. Co. 3d ed. 1933).  The definition was expanded in later editions.  Before and after the enactment of the Bankruptcy Code, the publication provided:

> Business trust.  As distinguished from a joint-stock company, a pure "business trust" is one in which the managers are principals, and the shareholders are cestuis que trust.  The essential attribute is that property is placed in the hands of trustees who manage and deal with it for use and benefit of beneficiaries. . . .  A "Massachusetts trust" or "common law trust."

BLACK'S LAW 5th Ed. at 180; Henry Campbell Black, A DICTIONARY OF LAW CONTAINING DEFINITIONS OF THE TERMS AND PHRASES OF AMERICAN AND ENGLISH JURISPRUDENCE, ANCIENT AND MODERN 250 (West. Pub. Co. 4th rev. ed. 1968) (citation omitted).  During the same time period, Professor Max Radin defined the phrase "business trust" as follows:

> Massachusetts trust.  Also known as a business trust.  A trust involving the transfer of property to trustees who correspond to the directors of a corporation.  Trust certificates are issued to the beneficiaries who correspond to the stockholders in a corporation . . . .

Max Radin, RADIN LAW DICTIONARY (Oceana Pub. 1955).

Another key legal dictionary followed with a more comprehensive definition of the phrase "business trust" in 1969:

> Business Trust.  Otherwise known as a Massachusetts trust or common-law trust.  A form of business organization consisting essentially of an arrangement whereby property is conveyed to trustees, in accordance with the terms of an instrument of trust, to be held and managed for the benefit of such persons as may from time to time be the holders of transferable certificates issued by the trustees showing the shares into which the beneficial interest in the property is divided.

William S. Anderson, BALLENTINE'S LAW DICTIONARY 164 (3d ed. Lawyers Co-op. Pub. 1969).  This definition tracks closely with the Supreme Court's *Hecht* and *Morrissey* decisions.

One key commonality to the definitions contained in all law dictionaries is the reference to the "Massachusetts trust."  Henry Campbell Black cross-referenced the "Massachusetts trust" in his definition of "business trust" and then separately defined it:

"Massachusetts trust.  A business organization wherein property is conveyed to trustees and managed for benefit of holders of certificates like corporate certificates."  BLACK'S LAW 5th Ed. at 180.

Invariably, in dictionaries, law journals and case law, a "business trust" is considered synonymous with the "Massachusetts trust."  One legal author noted:

> The term "Massachusetts trust," otherwise known as the, "business" or "common law" trust is used generally to denote an unincorporated organization created for profit under a written instrument or declaration of trust, the management to be conducted by compensated trustees for the benefit of persons whose legal interests are represented by transferable certificates of participation, or shares.

Comment, *Massachusetts Trusts,* 37 YALE L. J. 1103, 1104 (1928) (footnotes omitted). *See also* Note, *State Regulation of Foreign Business Trusts*, 41 HARV. L. REV. 86 (1927) (indicating that "Massachusetts trust" and "business trust" are synonyms).

When the term "business trust" passed over to standard (non-legal) dictionaries, the non-technical dictionaries gave the same meaning.  One of the more prominent and popular United States dictionaries frequently referenced by the Supreme Court as authoritative during the relevant time period defines "business trust" simply as "Massachusetts Trust."  WEBSTER'S THIRD NEW INT'L DICTIONARY 303 (G. & C. Merriam Co. 1968).  And, then, "Massachusetts trust" is defined almost exactly as in the legal dictionaries:

> an unincorporated business organization managed like and sometimes treated as a corporation . . . and first popular in Massachusetts in which the business capital is held in trust under a written declaration of trust publicly recorded outlining the powers and duties of the trustees and the rights of the beneficiaries and third persons, which capital or trust property is managed by the trustees for the beneficiaries who are the owners from time to time of transferable certificates resembling corporate stock evidencing an equitable interest in the trust property and the income earned by it.

*Id*. at 1388.

So, the relevant legal and non-legal dictionaries show that the phrase "business trust" started to be used in the first half of the twentieth century as a synonym to the "Massachusetts trust."  The key attributes match the *Morrissey* definition.

      c.     <u>Use of the Term "Business Trust" In Legal Articles Before<br>Enactment of the Bankruptcy Code</u>.

Authors of legal articles first started using the phrase "business trust" as a synonym of "Massachusetts trust" (and sometime "common law trust") approximately a hundred years ago (about a decade or more before the term first appeared in legal dictionaries and the *Morrissey* decision). *See* Comment, *The Nature of Massachusetts Business Trusts*, 27 YALE L. J. 677 (1918) (using "business trusts" in title but otherwise only referring to Massachusetts trusts); Austin W. Scott, *The Progress of the Law 1918-1919 Trusts*, 33 HARV. L. REV. 688, 704-05 (1920) (opening section entitled "business trusts" noted that "[t]he Massachusetts device of creating a trust for the carrying on of business is rapidly growing in popularity"); Note, *Taxation of Business Trusts*, 42 YALE L. J. 270, 271 (1932) ("[A]ny trust engaged in industrial or commercial enterprises will be called a business trust . . . ."). One author characterized the Massachusetts trust as "what would [later] popularly be known as a business trust." Edward H. Warren, *The Progress of the Law: Corporations*, 34 HARV. L. REV. 282 (1921).

Around the same time period, legal scholars published a handful of books which utilized the term "business trust" or something similar ("commercial trust"), mainly in reference to Massachusetts trusts. *See* Sydney R. Wrightington, THE LAW OF UNINCORPORATED ASSOCIATIONS AND BUSINESS TRUSTS (Little, Brown, and Co. 1923) (using "business trusts" only in title without defining term); William C. Dunn, TRUSTS FOR BUSINESS PURPOSES (Callaghan and Co. 1922) (not using "business trust" but referring to similar "trusts for business purposes" mainly under Illinois law); John H. Sears, TRUST ESTATES AS BUSINESS COMPANIES (Counselors Pub. Co. 1912) (not using phrase "business trust" but referring to similar concept; "This work is to consider to what extent arrangements may be made, whereby persons . . . may transfer legal title in, and control and management of property to another or others for purposes of trade . . . though the profits or income are to belong to the transferors.").

The working definition of "business trusts" used in academia has always been internally consistent and mirrors the *Morrissey* decision and legal dictionary definitions. For example, in one early-era article, the author used the terms "commercial trust" and "business trust" interchangeably and then wrote:

> The organizers of the business trust have manifested unmistakably the intention to establish . . . an active business under a continuous management, combining therewith the advantages of free transferability of the beneficial interests and a continuity of legal ownership.

Comment, *The Doctrine of Merger as Applied to Commercial Trusts*, 29 YALE L. REV. 97, 100 (1919). Several decades later (and much closer in time to the enactment of the Bankruptcy Code) Professor Michael L. Weissman defined the term "business trust" in the classic (and by then well-understood) fashion:

> A Massachusetts or "business trust" is a commercial
> enterprise formed by a declaration of trust wherein property
> is conveyed to trustees to be held and managed by them for
> the benefit of such persons as may, from time to time, be
> holders of transferable shares issued by the trustees and
> evidencing their beneficial interests in the trust estate.

Michael L. Weissman, *The Common Law of Business Trusts,* 38 CHICAGO-KENT LAW
REV. 11 (April 1961).  So, as used in legal scholarship, the phrase "business trust" has
the same meaning as in the *Morrissey* decision.

### d.   Use of the Term "Business Trust" In Other Legal Sources Before Enactment of the Bankruptcy Code.

One of the words in the phrase "business trust" is "trust."  So, one might suppose
that legal treatises about trust law may provide helpful information about the meaning of
the term "business trust" circa enactment of the Bankruptcy Code.  One of the most
authoritative works on trust law is the American Law Institute's RESTATEMENT OF TRUSTS,
as periodically amended.  The version of the RESTATEMENT OF TRUSTS effective in 1978
defined a "trust" as "a fiduciary relationship with respect to property, subjecting the
person by whom the title to the property is held to equitable duties to deal with the
property for the benefit of another person, which arises as a result of a manifestation of
an intention to create it."  RESTATEMENT (SECOND) OF TRUSTS § 2 (ALI 1959).  But, the
term "business trust" was not addressed at all except in a Comment excluding "business
trusts" from its purview.  RESTATEMENT (SECOND) OF TRUSTS (ALI 1959) (§ 1 Comment
(b); listing "business trusts" as "matters excluded").  "Business trusts" received the same
treatment in earlier and later versions.  *See* RESTATEMENT (FIRST) OF TRUSTS (ALI 1935)
(§ 1 Comment (b); listing "business trusts" as "matters excluded"); RESTATEMENT (THIRD)
OF TRUSTS (ALI 2003) (same).

In the absence of guidance from the American Law Institute, the Court turns to
other publications.  One of the leading treatises on trust law during the relevant period
was George Bogert, TRUSTS AND TRUSTEES (Thompson/West 2d ed. Supp. 1960).  In his
treatise, Professor Bogert explained that a "business trust" denotes:

> an unincorporated organization created for profit under a
> written instrument or declaration of trust, the management to
> be conducted by compensated trustees for the benefit of
> persons whose legal interests are represented by
> transferable certificates of participation, or shares.

*Id*. § 291 at 572 (quoted in *Limouze v. M.M.&P. Maritime Advancement, Training, Ed.
and Safety Program*, 397 F. Supp. 784, 788 (D. Md. 1975).  Again, this definition is a
close match to the *Hecht* and *Morrissey* definitions as a matter of general trust law.

Although perhaps not quite as academic, lawyers often turn to reports or compilations of the law for assistance with understanding legal terminology. Two well-known sources are the AMERICAN LAW REPORTS and AMERICAN JURISPRUDENCE. The same year Congress enacted the Bankruptcy Code, AMERICAN LAW REPORTS re-published a definition of the phrase "business trust" which had been used in the publication for decades:

> [A] business trust is an unincorporated business organization created by an instrument by which property is to be held and managed by trustees for the benefit and profit of such persons as may be or may become the holders of transferable certificates evidencing the beneficial interests in the trust estate.

*Modern Status of the Massachusetts or Business Trust,* 88 A.L.R. 3d § 3 at 717 (Lawyers Co-Operative Pub. Co. 1978); *see also Massachusetts or Business Trust,* 156 A.L.R. 27 (Lawyers Co-Operative Pub. Co. 1945) (same definition). Such language hews closely to the *Hecht* definition. In the period before passage of the Bankruptcy Code, many courts relied on the AMERICAN LAW REPORTS definition as an authoritative definition of the term "business trust" when explaining what the phrase means. *See Corcoran v. Brody,* 347 So. 2d 689, 689 (Fla. App. 1977); *People's Bank v. D'Lo Royalties, Inc.*, 235 So. 2d 257, 265 (Miss. 1970) ("The nature of business trusts is set forth in the annotation in [the AMERICAN LAW REPORTS] 156 A.L.R. 22 . . . ."); *Berry v. McCourt*, 204 N.E. 2d 235 (Ohio App. 1965) (describing AMERICAN LAW REPORTS, 156 A.L.R. 22, as a "comprehensive study of the law" with respect to business trusts).

The main competitor of the AMERICAN LAW REPORTS, AMERICAN JURISPRUDENCE also defined the phrase "business trust" not long before the Bankruptcy Code became law:

> One of the distinctive devices by means of which individuals may combine their resources to operate a business for profit is the so-called business trust, or 'Massachusetts trust,' which may be comprehensively defined as an unincorporated business organization created by an instrument by which property is to be held and managed by trustees for the benefit and profit of such persons as may be or may become the holders of transferable certificates evidencing the beneficial interests in the trust estate.

*Business Trusts*, 13 AM. JUR. 2d § 1 (Supp. 1967). The substance of the AMERICAN JURISPRUDENCE definition of "business trust" tracks almost verbatim the same definition in the AMERICAN LAW REPORTS.

    e.    **<u>Use of the Term "Business Trust" in State Law Before Enactment of the Bankruptcy Code</u>.**

As explained earlier, state law (whether statutory or common law) generally is not dispositive when interpreting a word or term in a federal text.  However, as with other sources (such as federal case law, dictionaries, articles, treatises, reports and the like) state law may be relevant to assist in determining the general meaning of words or phrases during the time period when federal legislation is passed and may have a bearing on the purpose for creation of a particular trust.

Although the Court will not engage in a fifty-state analysis of state law provisions, it will suffice to examine a brief sampling of state statutes pertaining to "business trusts" during the relevant era.  As already noted, Massachusetts originated the concept of what became known as a "business trust" in the United States.  The Massachusetts legislation (which was first enacted in 1909) does not utilize the phrase "business trust." But Chapter 182 (which is titled: Voluntary Associations and Trusts) defines a "trust" (for purposes of that Chapter) as:

> a trust operating under a written instrument or declaration of trust, the beneficial interest under which is divided into transferable certificates of participation or shares . . . .

Mass. Gen Law. Chap 182 § 1 (1978).

After Massachusetts spearheaded the "business trust" idea, numerous other states enacted "business trust" statutes in the period before the Bankruptcy Code was enacted.  For example, New York weighed in with a new statute in 1937 (which is still in effect):

> The term "business trust" means any association operating a business under a written instrument or declaration of trust, the beneficial interest under which is divided into shares represented by certificates.

N.Y. Gen. Ass'ns Law § 2(2) (McKinney 1937).

Closer in time to the passage of the Bankruptcy Code, several State legislatures passed new "business trust" statutes.  In 1961, Alabama set forth a definition for the phrase "business trust":

> A business trust is an express trust created by a written declaration of trust whereby property is conveyed to one or more trustees, who hold and manage the same for the benefit and profit of such persons as may be or become holders of transferable certificates evidencing the beneficial interest in the trust estate.

31

ALA. CODE § 19-3-60 (1961).  The same year, the Kansas legislature passed something very similar:

> A "business trust" is an unincorporated business association of the type which at common law was known as a "common-law trust," "business trust," or "Massachusetts trust," created by a trust instrument under which property is held, managed, administered, controlled, invested, reinvested, and operated by trustees for the benefit and profit of such persons as are or may become the holders of transferable certificates evidencing beneficial interests in the trust estate, the holders of which certificates are entitled to the same limitation of personal liability extended to stockholders of private corporations for profit.

KAN. STAT. § 17-2028 (1961).  Two years later, Indiana followed suit with the Indiana Business Trust Act which stated:

> A "business trust" is an unincorporated business association which is created by a trust instrument, pursuant to common law or enabling legislation, under which property is held, managed, administered . . ., or operated, . . . by a trustee or trustees for the benefit and profit of such person or persons as are or may become the holders of transferable certificates, issued pursuant to the provisions of the trust instrument . . . evidencing beneficial interests in the trust estate . . . .

IND. CODE. ANN. § 23-5-1-2(a) (1963).

The foregoing is only an illustration of a few representative state statutes effective when Congress enacted the Bankruptcy Code.  Rather than cite them all, the point is only that the state laws are remarkable in utilizing almost identical definitions of the term "business trust."  And, those definitions hew very closely to the *Hecht* and *Morrissey* definitions.  There is just no daylight between them.  And, of course, Congress (and the legal community) knew that when the Bankruptcy Code became law.

Notwithstanding the cited state statutes which recognize and define business trusts, there are plenty of states which do not recognize "business trusts" within their general trust statutes and do not otherwise provide for "business trusts."  Texas is a prime example.  The Trust Agreement is governed by Texas law.  Tr. Agr. § 5.4.  And, the Trust Agreement refers to application of the "Texas Trust Code."  Tr. Agr. § 4.1. But, the Texas Trust Code (both at the time  the Trust Agreement was executed (1986) and now) expressly excludes "a business trust" from its purview.  TEX. PROP. CODE ANN. § 111.003 (Vernon 1984) (for purposes of the Texas Trust Code, a "trust "does not

include . . . a business trust."). And, "[t]here is no effective device creating a business trust under Texas law." *In re Action Roofing & Supply Co.,* 137 B.R. 217, 219 (Bankr. S.D. Tex. 1991).

### f.   The Meaning of the Term "Business Trust" as Used in Section 101(9) of the Bankruptcy Code.

Having now fully analyzed the history and meaning of the term "business trust," the Court can confidently state the plain legal meaning when the phrase was used by Congress in 1978 as part of the Bankruptcy Code. "Business trust" is a legal term of art and has specialized meaning. The definitive and binding definition of the term "business trust" was articulated by the Supreme Court in *Hecht*, 265 U.S. at 146-47, and *Morrissey*, 296 U.S. at 357-39. According to the Supreme Court, the "salient features" of a business trust are:

  (1) a trust "created and maintained" for a business purpose;

  (2) title to property held by trustees;

  (3) centralized management;

  (4) continuity uninterrupted by death among beneficial owners;

  (5) transferability of interests; and

  (6) limited liability.

*Morrissey*, 296 U.S. at 357-59 (paraphrasing holding; not quoting text). *See also Mosby v. Boatmen's Bank of St. Louis County (In re Mosby)*, 61 B.R. at 638 (citing attributes of "business trust" listed in *Morrissey*), *aff'd* 791 F.2d 628 (8th Cir. 1986). The foregoing is the "classic definition." *Navarro*, 466 U.S. 467-68. It has been applied in many types of federal cases including taxation, securities, and federal jurisdiction disputes. And, considering the nature and purpose of bankruptcy (as well as the eligibility requirements), the Court determines that the ordinary legal meaning of the term "business trust" should apply in bankruptcy too.

The Supreme Court did not conjure the definition of "business trust" from thin air. Instead, by the time the Supreme Court announced its *Morrissey* decision, the phrase "business trust" already had a well-understood legal meaning. Before and after the *Morrissey* decision, repeatedly, an unbroken line of federal cases, legal dictionary definitions, legal articles, legal treatises, legal reports, state statutes, and other legal sources reaffirmed the same basic attributes for a "business trust." By 1978, the legal understanding of the phrase "business trust" under the Bankruptcy Code was abundantly clear.

Thus, the *Hecht* and *Morrissey* definitions (which comport with all the legal sources) must be used to interpret the phrase "business trust" used in the Bankruptcy Code. *See In re Sung Soo Rim Irrevocable Intervivos Tr.*, 177 B.R. at 675 (using the "purpose test of *Morrissey*"); *Loux v. Gabelhart (In re Carriage House, Inc.)*, 120 B.R. 754, 764 (Bankr. D. Vt. 1990) (relying on "elements" of "business trust" stated in *Hecht* and *Morrissey* decisions); *In re St. Augustine Tr.*, 109 B.R. 494, 495-96 (Bankr. M.D. Fla. 1990) (applying *Morrissey* definition of "business trust" under Bankruptcy Code); *In re Vivian A. Skaife Irrevocable Tr. Agreement No. 1*, 90 B.R. 325, 328 (Bankr. E.D. Tenn. 1988) (applying *Morrissey* definition of "business trust" in bankruptcy case); *In re L&V Realty Tr.*, 61 B.R. 423, 424 (Bankr. D. Mass. 1986) (applying the *Hecht* definition of "business trust" under the Bankruptcy Code); *Mosby,* 61 B.R. at 638 (applying *Morrissey* definition of "business trust" in bankruptcy case).

## C.    Bankruptcy Caselaw Construing the Term "Business Trust."

In the 45 years since enactment of the Bankruptcy Code, many bankruptcy courts have had occasion to construe the meaning of the phrase "business trust" in Section 101(9). In fact, the cases are quite legion. However, unfortunately, very few courts have construed the meaning of the term "business trust" using standard principles of statutory interpretation. As a result, a perceived lack of uniformity has developed. According to one bankruptcy court considering the topic decades ago: "The decisions are sharply, and perhaps hopelessly divided on the meaning of 'business trust.'" *In re Medallion Realty Tr.,* 103 B.R. 8, 10 (Bankr. D. Mass 1989). Subsequently, many courts seized on the "hopelessly divided" narrative to make up their own definitions. *See Shawmut Bank Co., N.A. v. First Fidelity Bank (In re Secured Equip. Tr. of Eastern Airline, Inc.)*, 38 F.3d 86, 89 (2d Cir. 1994) (citing "hopelessly divided" language and applying various factors); *Cutler*, 831 F. Supp. at 1014 (describing decisions determining whether a trust is a "business trust" as hopelessly divided and applying "modern case-by-case approach" to evaluate the issue); *Cath. Sch. Emp. Pension Tr.*, 599 B.R. at 634 (noting that there is a consensus among courts that no uniform standard exists to define what constitutes a "business trust" for purposes of the Trust's eligibility under § 109(a) and concluding that courts should apply a multi-factor approach).

Although the Supreme Court has not directly addressed the interpretation of the phrase "business trust" in a case under the Bankruptcy Code, three courts of appeals have spoken on the subject. In *Mosby v. Boatmen's Bank of St. Louis County*, the Eighth Circuit Court of Appeals matter-of-factly endorsed a district court opinion deciding that the "distinguishing characteristics of a business trust" are those listed in the Supreme Court's *Morrissey* decision. 791 F.2d 628 (affirming opinion in *Mosby*, 61 B.R. 636, 638 (E.D. Mo. 1985)). A decade later, the Second Circuit Court of Appeals arrived on the scene and observed:

> Although no court has thus far adopted a clear definition of business trust for purposes of the Bankruptcy Code, courts have looked to see whether the trust at issue has the

> attributes of a corporation. . . . . Courts have noted a variety
> of factors in making this determination, but there is no
> definitive list of characteristics that constitute a business
> trust.

*Shawmut Bank,* 38 F.3d at 89 (citations omitted).  But after making that observation, the Second Circuit Court of Appeals seemingly decided to forego adopting a definition of "business trust" itself.  Instead, the appellate panel noted merely:

> [M]ost courts agree that a basic distinction between a
> business trust and other trusts is that business trusts are
> created for the purpose of carrying on some kind of
> business, whereas the purpose of a non-business trust is to
> protect and preserve the res.

*Id*.  Although the appellate court did not refer to either the *Hecht* or *Morrissey* cases, the foregoing observation (which is correct) seems to focus only on the first factor listed in the *Morrissey* decision.  *Morrissey*, 296 U.S. at 357 ("In what are called 'business trusts' the object is not to hold and conserve particular property, but to provide a medium for the conduct of a business and sharing its gains.").  Ultimately, the *Shawmut Bank* case is not very helpful because the appellate panel failed to provide a comprehensive list of the attributes of a "business trust."  *Sung Soo Rim Irrevocable Intervivos Tr.*, 177 B.R. at 675 ("The Second Circuit's subjective analysis [in *Shawmut*], however, yields no rule of decision that provides any guidance for other courts.).  Finally, the last appellate decision on the topic is *Brady v. Schilling (In re Knight Tr.)*, 121 F.3d 708, 1997 WL 415318, at *4 (6th Cir. 1997) (unpublished) [hereinafter *Knight Trust I*], a decision which preceded the 2002 *Knight Trust II* decision discussed earlier.  There, the Sixth Circuit Court of Appeals adopted a so-called "primary purpose" test:

> Thus, trusts created with the primary purpose of transacting
> business or carrying on commercial activity for the benefit of
> investors qualify as business trusts, while trusts designed
> merely to preserve the res for beneficiaries generally are not
> business trusts.

*Knight I,* 1997 WL 415318, at *4.  *See also Knight Tr. II*, 303 F.3d at 680 (re-endorsing the "primary purpose" test and also stating that the determination is "fact-specific" but without identifying any further factors).

Ultimately, the Court agrees with the Eighth Circuit Court of Appeals' decision in *Mosby*, which effectively adopts the *Morrissey* factors, 296 U.S. at 357-59, and stays true to the meaning of the term "business trust" when the Bankruptcy Code was passed. Neither the *Shawmut Bank* nor the *Knight Trust I* decision is grounded in the full meaning of the phrase "business trust."  The *Knight Trust I* decision is too narrow and inexplicably asserts that a single factor is dispositive: whether the trust was "created with the *primary* purpose of transacting business."  (Emphasis added.)  To be sure, the

purpose of the creation of the trust is important — perhaps even the most important part of the analysis.  After all, even the Supreme Court emphasized that characteristic of a "business trust" first in *Morrissey*, 296 U.S. at 357.  But, the "primary" requirement seems pulled from thin air.  And, the purpose of the trust is not the end of the assessment.  In addition to looking at the trust's purpose when created, the Court also must consider the trust's actual post-creation operations.  In *Morrissey*, the Supreme Court explored the "salient features" of a trust "when created *and maintained* as a medium for the carrying on of a business enterprise."  *Id*. at 359 (emphasis added).  And, then, there are a whole host of other key attributes of a "business trust" according to common legal meaning, including: centralized management; continuity; transferability of interests; and limited liability.  If those other features are absent, the entity likely will not qualify as a "business trust" even if the entity is a trust created to do business.  Neither the *Shawmut Bank* nor the *Knight Trust I* decision comes to grips with the accepted legal meaning of the term "business trust" in 1978.

Beyond the foregoing appellate decisions, bankruptcy courts have used a hodgepodge of different analysis to decide which trusts constitute "business trusts."  The recent *Catholic School Employees Pension Trust* decision initially identified three main approaches: "the 'primary purpose' test, the multi-factor test, and a six-factor test derived from a Supreme Court tax case [*Morrissey*]."  *Cath. Sch. Emp. Pension Tr.*, 599 B.R. at 654.  The "six factor" test from the Supreme Court's *Morrissey* decision is fairly self-evident.  *Morrissey*, 296 U.S. at 357-59.  And, the "primary purpose" test stems from the *Knight Trust I* decision described above.  *Knight Trust I,* 121 F.3d 708 at *4.  For, the "multi-factor" test, the *Catholic School Employees Pension Trust* court contends such approach stems from the *Shawmut Bank* case.  *Shawmut Bank,* 38 F.3d at 89.  However, the *Shawmut Bank* case simply never articulated a "multi-factor" test.  Instead, in *Shawmut Bank*, the appellate court stated:  "Courts have noted a variety of factors in making this ["business trust"] determination, but there is no definitive list of characteristics that constitutes a business trust."  *Id*.  Then, the Sixth Circuit Court of Appeals cited a smattering of bankruptcy court decisions to illustrate a few factors before suggesting "each decision is based on a very fact-specific analysis of the trust issue."  *Id*.  Turning back to the *Catholic School Employees Pension Trust* case, after identifying the three main approaches, the appellate panel started listing even more tests such as the "*Dille Family Trust* Test," which also was characterized as another "multi-factor" test.  *Cath. Sch. Emp. Pension Tr.*, 599 B.R. at 660.  And, ultimately, the *Catholic School Employees Pension Trust* appellate panel gave a nod to the new "*Dille Family Trust* Test."

In *Murphy v. Bernstein (In re Dille Family Tr.)*, 598 B.R. 179, 194 (Bankr. W.D. Penn. 2019), a bankruptcy court tried to rationalize the case law and came up with this:

> A fair reading or synthesis of the case law  . . . is that the riddle of whether a trust constitutes a valid "business trust" turns on two generally required elements.  The first is whether the trust itself was created for the purpose of transacting business for a profit (as opposed to merely

36

> preserving a res for beneficiaries).  The second is whether
> the trust in-fact has all the indicia of a corporate entity.  If
> both these items are present, then the trust at issue is more
> than a gratuitous or ordinary trust and is a business trust.  If
> any of these two characteristics is not present, then the trust
> is not a "business trust" and is ineligible for bankruptcy relief
> under Chapter 11 . . . .

*Dille Family Tr.*, 598 B.R. at 194.  Ignore for the moment that the Court's task is a "fair reading" of the Bankruptcy Code, not a "fair reading" of case law.  The rest sounds good.  But, the new *Dille Family Trust* two-part test is mostly just the *Morrissey* factors in disguise.  In both *Morrissey* and *Dille Family Trust*, the starting place is whether the trust has been created for carrying on a business enterprise.  (The Court does not know why the *Dille Family Trust* decision deleted reference to post-creation operations (*i.e.*, "maintain" a business purpose.))  And, then the *Dille Family Trust* case proposes to assess whether the trust "has all the indicia of a corporate entity."  The "indicia of a corporate entity" happens to be all the attributes listed separately in the *Morrissey* precedent such as: centralized management; continuity uninterrupted by death among beneficial owners; transferability of interests; and limited liability.

Bankruptcy courts seem to have taken it on themselves to issue their own new definitions of the phrase "business trust" or have avoided tethering themselves to any definition by relying on long lists of factors.  *See, e.g.*, *In re Arehart*, 52 B.R. 308, 310 (Bankr. M.D. Fla. 1985) (purporting to rely on "24 factors" from *Matter of Cohen*, 4 B.R. 201 (Bankr. S.D. Fla. 1980)).  Ultimately, the Court determines that all the various formulations and re-formulations of tests for "business trusts" articulated by various bankruptcy courts over the years — there are dozens and dozens — are not especially helpful.  There is no reason for bankruptcy judges to try to reinvent the wheel.  The real test should be based upon the meaning of the term "business trust" when the Bankruptcy Code was enacted.  At that point in time, there was simply no doubt what the phrase meant.  *Rippey*, 260 F. Supp. at 714 ("[t]he difference between [a] business trust and an ordinary trust is so well established that it hardly needs to be documented . . . .").  All the relevant legal sources (including federal case law, legal dictionaries, legal articles, legal treatises, legal reports, and state law) point in exactly the same direction: a test based upon the Supreme Court's *Hecht* and *Morrissey* definitions.

## D.    Legislative History Concerning the Term "Business Trust."

The Court is quite reticent to engage in an analysis and discussion of legislative history as part of its statutory interpretation work.  In fact, the exercise of trying to divine intent from legislative statements (whether from floor speeches, debates, or committee reports) is a sort of fiction. *See* Reading Law at 394 ("The use of the term *legislative intent* encourages this search for the nonexistent.")  And, the Court's objective its not to try and guess what hundreds of legislators might have meant but merely to construe the text they actually enacted.

However, since many bankruptcy courts considering the phrase "business trust" seem intent on searching for legislative history, the Court briefly addresses the topic. As already pointed out, the first time Congress used the term "business trusts" in the context of insolvency was when it passed the Bankruptcy Code in 1978. Even though the term "business trust" was not used previously, in 1926 Congress amended the Bankruptcy Act of 1898 (30 Stat. 552) to cover a similar concept. The word "corporation" in Section 1(6) of the Bankruptcy Act was redefined to include:

> any business conducted by a trustee or trustees wherein beneficial interest or ownership is evidenced by certificate or other written instrument.

44 Stat. 662 (the "1926 Amendment"). *See also Pope & Cottle Co. v. Fairbanks Realty Tr.*, 124 F.2d 132, 135 (1st Cir. 1941) (describing change). The 1926 Amendment was designed to ensure that "Massachusetts trusts" could file for bankruptcy protection. *Medallion Realty Tr.*, 103 B.R. at 11 (1926 Amendment to Bankruptcy Act "opened the door to the traditional Massachusetts business trust"); James Angell McLaughlin, *Amendment of the Bankruptcy Act*, 40 Harv. L. Rev. 341, 355-56 (1927). It seems evident that Congress did not use the term "business trust" in the 1926 Amendment to the Bankruptcy Act because (as explained earlier), the term "business trust" was not widely-used during that time period. Recall that the first use of the phrase "business trust" in federal case law and dictionaries did not occur until *after* the 1926 Amendment. In any event, because of the 1926 Amendment, entities which later became known as "business trusts" were eligible for bankruptcy protection.

Decades afterward, as Congress began to consider a rewrite of the Bankruptcy Act and adoption of the modern Bankruptcy Code, the Commission on the Bankruptcy Laws of the United States (the "Bankruptcy Commission") proposed that Congress amend the definition of "corporation" by incorporating the new term "business trust" in place of "any business conducted by a trustee or trustees wherein beneficial interest or ownership is evidenced by certificate or other written instrument." Report of the Commission on The Bankruptcy Laws of the United States House Doc. 93-137 Part II at 2 (July 1973) (the "Commission Report"). In the Commission Report, the Bankruptcy Commission stated:

> The reference at the end of the definition to a "business trust" eliminates the requirement of the present Act that beneficial interest or ownership "be evidenced by certificate or other written instrument." The requirement gives undue significance to an evidentiary formality.

*Id.* at 7.

Some Courts have seized on the foregoing as evidencing some sort of legislative intent. *See Cath. Sch. Emp. Pension Tr.*, 599 B.R. at 656; *Medallion Realty Tr.*, 103 B.R. at 11. However, the Commission Report does not demonstrate legislative intent.

After all, the Bankruptcy Commission is not Congress.  And, when Congress finally passed the Bankruptcy Code (five years) later, Congress excised the foregoing explanation contained in the Commission Report.  Instead, the House of Representatives and Senate Reports accompanying the Bankruptcy Code and justifying the change only blandly state that "[t]he definition of "corporation" in paragraph (8) [now Section 101(9)] is similar to the definition in current law [the Bankruptcy Act]."  H.R. Rep. No. 595, 95th Cong., 1st Sess. 309 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 22 (1978).  So, it seems that the Bankruptcy Commission rationale was rejected even though Congress did use the word "business trust" in the Bankruptcy Code because it was "similar" to the Bankruptcy Act requirement.

What to draw from all that?  Probably not much.  It appears that the term "business trust" merely served as a modern-day update and simplification (two words instead of 21) of an unwieldy run-on phrase under the Bankruptcy Act: "any business conducted by a trustee or trustees wherein beneficial interest or ownership is evidenced by certificate or other written instrument."  "Business trust," which was a term not in common usage when the 1926 Amendment was adopted, seemed to fit the bill.  And, by 1978 the legal meaning of the phrase "business trust" must have seemed quite clear to American legislators.  As already explained, virtually every definition of the term "business trust" available in 1978 (in federal case law, the *Hecht* and *Morrissey* decisions, legal dictionaries, law journal articles, treatises, law reports, and state statutes) confirmed that transferable interests (whether in the form of certificates or shares) were a key attribute of a "business trust."

But some bankruptcy decisions see it differently.  *See Knight Tr. II*, 303 F.3d at 679 ("We join those courts that have concluded that Congress intended to dispense with the transferable-certificate-of-ownership requirement when it changed the statute in 1978."); *In re Village Green Realty Tr.*, 113 B.R. 105, 114 (Bankr. D. Mass 1990) (noting that "the drafters of the Bankruptcy Code eliminated the requirement of transferable shares"); *Treasure Island Land Tr.*, 2 B.R. 332, 333 (Bankr. M.D. Fla. 1980) ("In eliminating the requirement of written instruments, Congress has presumably made it possible for a broader variety of trusts to obtain relief in the bankruptcy courts.").

Respectfully, the Court disagrees.  In enacting the Bankruptcy Code, Congress did not "dispense with" or "eliminate" the requirement of transferable interests.  If Congress had done so, Section 101(9)(a)(v)of the Bankruptcy Code would now read:

> any business conducted by a trustee or trustees ~~wherein beneficial interest or ownership is evidenced by certificate or other written instrument.~~

But Congress did not do that.  It did not "dispense with" or "eliminate" anything.  Instead, it substituted the new term "business trust" in place of the entire passage from the Bankruptcy Act.  And, as explained at length previously, when Congress used the term "business trust," the phrase already had well-understood legal meaning including the requirement that beneficial interests be evidenced by transferable certificates or shares.

39

Ultimately, the Court should not have to try to guess at what Congress might have intended or not intended.  Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 HARV. L. REV. 417, 419 (1899) (the Court should not decide "what the legislature meant . . . [but] only what the statute means."); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.").  Instead, a judge must focus on the words of the statute.  Congress chose the phrase "business trusts."  When it did so, the term had plain legal meaning.  And that "old soil" (including transferability) comes with it.

**E.      Application:  the Trust is Not a "Business Trust" and Its Bankruptcy Case Must Be Dismissed.**

      **1.      The Trust Was Not Created and Maintained for a Business Purpose an Has No Centralized Management.**

The most important factor for determining whether a trust is eligible to file for bankruptcy protection as a "business trust" under Section 101(9) is whether the trust was "created and maintained" for a business purpose.  *Morrissey*, 296 U.S. at 359; *see also Shawmut Bank*, 38 F.3d at 89 ("a basic distinction between a business trust and other trusts is that business trusts are created for the purpose of carrying on some kind of business, whereas the purpose of a non-business trust is to protect and preserve the res.").  There are two discrete inquiries stemming from the phrase "created and maintained."  The first focuses on the intention or purpose at the time of formation.  Then, if the trust was created for business purposes, the second inquiry asks whether the trust actually engaged in business activities.

The trust instrument serves as key evidence of the purpose of any trust at formation.  *See Shawmut Bank*, 38 F.3d at 90 (focusing on trust indenture to ascertain purpose); *Dille Family Tr.*, 598 B.R. at 194 ("the Court looks to the trust instrument" to determine the trust's purpose); *Skaife Irrevocable Tr.*, 90 B.R. at 328 ("An examination of the trust documents is essential to a just determination of whether a trust qualifies as a business trust.").

In this case, the Trust Agreement is plain about original intent.  The main purpose of the Trust (explained in the very first paragraph) was to provide for Ms. Douglass' "health, support, and maintenance . . . in order to maintain [her], to the extent reasonably possible, in accordance with [her] accustomed standard of living."  Tr. Agr. § 1.1.  The Grantor was Ms. Douglass' father.  So, he was providing for his daughter.  When all the beneficiaries of a trust are family members, such trusts typically are family trusts, not "business trusts."  Notably, the Trust Agreement does not identify the beneficiaries' respective ownership interests in the Trust by percentage, shares, or certificates.  The Trust also is a donative trust.  *Dille Family Tr.*, 598 B.R. at 199 ("a traditional trust facilitates a donative transfer, whereas a business trust implements a bargained-for-exchange").  Nothing in the Trust Agreement indicates that Ms. Douglass

contributed anything to the Trust (*i.e.,* made an investment in the Trust).  Instead, the Trust Agreement provides that only the Grantor contributed property to the Trust.  Tr. Agr. at Preamble.  So, the sole remaining beneficiary did not put her capital at risk.  And, nothing in the Trust Agreement states that its purpose was to conduct business activities.

Other features of the Trust Agreement support the stated purpose: to provide for Ms. Douglass' "health, support, and maintenance."  For example, the Trust Agreement contains a classic spendthrift clause which states:

> Prior to the actual receipt of such property by any beneficiary, no property (income or principal) distributable under any trust created by this instrument shall be subject to anticipation or assignment by any beneficiary, or to attachment by or to the interference or control of any creditor or assignee of any beneficiary, or be taken or reached by any legal or equitable process in satisfaction of any debt or liability of any beneficiary, and any attempted transfer or encumbrance of any interest in such property by any beneficiary hereunder prior to distribution shall be absolutely and wholly void.

Tr. Agr. § 5.1.  Another part of the Trust Agreement reenforces such provision: "no Beneficiary shall have the power pursuant to this section to appoint trust property to himself or herself, his or her creditors, his or her estate, or the creditors of his or her estate."  Tr. Agr. § 1.5.

In closing argument, counsel for the Trust started out denying that the Trust was a spendthrift trust.  But that position is obviously wrong.  The meaning of the term "spendthrift trust" is not a deep mystery.  Under the heading "Spendthrift Trusts," Texas law (which governs the Trust Agreement) states:

> A settlor may provide in the terms of the trust that the interest of a beneficiary in the income or in the principal or in both may not be voluntarily or involuntarily transferred before payment or delivery of the interest to the beneficiary by the trustee.

TEX. PROP. CODE ANN. § 112.035(a).  Stated another way:

> Trusts with language prohibiting the voluntary or involuntary alienation of the beneficial interest in the trust are considered "spendthrift trusts."  A spendthrift trust provides direct protection from creditors of a beneficiary by expressly forbidding alienation of the beneficiary's interest in the trust.

41

*Tex. Com. Bank N.A. v. U.S.*, 908 F. Supp. 453, 457 (S.D. Tex. 1995) (also discussing TEX. PROP. CODE ANN. § 112.035(a)); *see also In re Ozcelebi,* 639 B.R. 365, 385 (Bankr. S.D. Tex. 2022) (quoting *Bradley v. Ingalls (In re Bradley)*, 501 F.3d 421, 428 (5th Cir. 2007) ("'In general, a spendthrift trust is one in which the right of the beneficiary to future payments of income or capital cannot be voluntarily transferred by the beneficiary or reached by his or her creditors.'")).

Plainly, the Trust is a spendthrift trust designed as an estate planning vehicle to protect assets for the benefit of Ms. Douglass.  In her personal bankruptcy case which she filed some years ago in Texas (*In re Paula Terry Douglass*, Case No. 17-34716 (Bankr. S.D. Tex.)), Ms. Douglass confirmed her understanding and stated: "In 1986, Ira Terry created the Tiel Trust I as a spendthrift trust for the benefit of his . . . daughter Paula Douglass."  *See In re Paula Terry Douglass*, Case No. 17-34716 (Bankr. S.D. Tex.), Docket No. 133 at 13.  So, she fought to protect the assets of the Trust from being available for her creditors.  Business trusts typically do not have spendthrift provisions.  A real business cannot conduct operations and then hide behind a spendthrift provision to avoid paying its creditors.  In any event, a spendthrift clause in the Trust Agreement is very powerful evidence that the Trust does not have a business purpose.

There is more strong evidence that the Trust was not created as a business trust for a business purpose.  The Trust Agreement is governed by Texas law and refers to the Texas Trust Code.  Tr. Agr. §§ 4.1 and 5.4.  This must have been a very conscious choice by the Grantor because he lived in Louisiana.[66]  No matter, he chose Texas law. But, the Texas Trust Code (both at the time the Trust Agreement was executed (1986) and now) expressly excludes "a business trust" from its purview.  TEX. PROP. CODE ANN. § 111.003 (for purposes of the Texas Trust Code, a "trust" "does not include . . . a business trust.").  To put it more starkly, "[t]here is no effective device creating a business trust under Texas law."  *Action Roofing & Supply Co.,* 137 B.R. at 219.  So, if the Grantor was trying to create a "business trust" he chose the wrong State.  This is not to say that Texas law controls interpretation of the term "business trust" in the Bankruptcy Code.  Instead, the Court has already determined that the Court must apply federal law and standard principals of statutory interpretation when construing eligibility under Section 101(9).  But, the Grantor's choice of law goes a long way toward showing intent.  The Grantor almost certainly did not try to create a business trust with a business purpose when he chose to create the Trust in a location (Texas) where such a thing cannot be created.  *Id*. (dismissing bankruptcy case because purported "business trust" was not eligible to be a bankruptcy debtor).

Even if the Trust had been created for a business purpose, the Court still would need to assess whether the Trust was "maintained" for a business purpose.  The Trust's principal historical activity proves that the Trust was not "maintained" for a business purpose.  The evidence shows that the Trust was given or acquired the Aspen Home years ago.  That is — by orders of magnitude — the Trust's principal asset.  The Trust has never earned income from the Aspen House.  The Trust has neither rented nor sold

---

[66]   Ex. 1 at 12.

the Aspen Home.  Instead, Ms. Douglass just lives in the Aspen Home rent-free.  Allowing Ms. Douglass to live for free in the Aspen Home with her antiques and artwork is not any type of business activity.  And, the Trust has no officers, directors, managers, or employees.  There is no physical location for the Trust.  There is no centralized management.  It is just Ms. Douglass operating as the co-trustee and sole beneficiary along with her step-son as the other co-trustee.  So, the Trust lacks many of the attributes of a business.

But, there is a hitch highlighted by the Trust.  Someone at some time (no one knows who or exactly when) purchased railroad cars and placed them into the Trust.  Currently, the Trust owns seven railroad cars which are operable and leased for periods expiring after January 2024.  The Trust also owns nine railroad cars which are inoperable and "need[] to be scrapped."  The estimated scrap value of the Trust's railroad cars depends upon weight and varies between $5,491.00 to $9,063.00 per car.  The "estimated scrap value" of all the nine inoperable railroad cars owned by the Trust is $63,341.00.  Further, the "estimated scrap value" of all the seven operable railroad cars is $47,464.00.

Although the Trust has not earned any income since the commencement of the bankruptcy case, in the past, the Trust received income for lease of the railroad cars.  For example, for the quarter ended March 31, 2023, the Trust received net rentals of $10,349.95 (which amount is derived from leases of nine railroad cars).  The monthly average rentals were $3,449.98 during such period.  The meagre railroad car rental (along with scrapping inoperable railroad cars) is the only source of revenue for the Trust.

The Trust contends that the receipt of rental income from the lease of the railroad cars constitutes a business activity.  *See*, *e.g.*, *Ikalowych*, 629 B.R. at 276 (construing the phrase "commercial or business activities" in Section 1182(1)(A) and determining that the phrase means: "private sector actions related to buying, selling, financing, or using goods, property, or services, undertaken for the purpose of earning income (including by establishing, managing, or operating an incorporated or unincorporated entity to do so)").

From the foregoing, the Court concludes that the Trust has been involved in some nominal business activity.  So be it.  But that is not the right inquiry.  Under *Morrissey*, 296 U.S. at 357-59, the Court is supposed to evaluate whether the Trust was *maintained for a business purpose*.  In this Court's view, some incidental business activity does not show that the Trust was maintained for a business purpose.  Instead, the occasional receipt of some rental income from the railroad cars is in no way contrary to the main purpose of the Trust: to provide for Ms. Douglass' "health, support, and maintenance . . . ."  After all, virtually every Trust (except perhaps the trust at issue in *Quadruple D Trust*, 639 B.R. 204) engages is some business activity.  For example, depositing money in a bank and earning interest may qualify as a business activity.  But that does not mean that every donative family trust with a bank account somehow is transmogrified into a business trust.  Instead, the Court must evaluate whether the Trust

43

met its burden of proof on eligibility by establishing the *Morrisey*, 296 U.S. at 357-59, factors. In this, the Trust failed. *See In re Two Rivers Irrevocable Tr.*, 653 B.R. 284, 291 (Bankr. M.D. Ga. 2023) (dismissing case because debtor trust was not a "business trust" even though trust "supposedly leased land and recreational vehicles"); *St. Augustine Tr.*, 109 B.R. at 496 ("the mere fact that the trust happens to engage in business activities does not therefore make it a 'business trust' within the meaning of the Code. Accordingly, the debtor is not entitled to the relief sought, and the case must be dismissed."); *Skaife Irrevocable Tr.*, 90 B.R. at 328 ("court concludes that the trust . . . is a family trust created exclusively for the benefit of the grantor's children and that the conduct of business activities is but one of a number of methods by which the trustee may further the purpose of the trust. The motion to dismiss the debtor's Chapter 11 case will accordingly be granted.") In fact, the point is so obvious that the very first federal decision using the phrase "business trust" effectively refutes the Trust's incorrect premise. In *Lewellyn*, 35 F.2d at 150, the Third Circuit distinguished between a "common law trust" (or a donative trust) and a "business trust." The appellate court recognized that where the trustee "merely collects dividends or interest, or *rentals*" and distributes such funds to beneficiaries, that type of trust is not a "business trust." *Id.* (emphasis added). So, engaging in some passive business activity, such as collecting rents from the seven operable railroad cars or collecting interest from two bank accounts does not make the Trust a business trust. Instead, the Trust is simply a family donative trust.

### 2. The Trust Lacks Continuity.

In *Morrisey,* the Supreme Court held that another important attribute of a business trust is continuity uninterrupted by death among beneficial owners. *Morrisey,* 296 U.S. at 357-59. The Trust also fails that test. The Trust continues only "for the lifetime of the Beneficiary thereof. Each trust shall terminate upon the death of the Beneficiary thereof." Tr. Agr. § 1.6. The termination upon death provision establishes that the Trust is merely a typical family donative trust.

### 3. Interests in the Trust Are Not Transferrable.

Another important attribute of a "business trust" is transferability of interests. *Morrisey,* 296 U.S. at 357-59. As already explained, the Trust Agreement does not identify the beneficiaries' respective ownership interests in the Trust by percentage, shares, or certificates. That failure suggests the impossibility of any transfer of interests. And, more importantly, the Trust Agreement contains a specific spendthrift provision prohibiting all transfers of interests. "[E]very case that has involved a restriction on the transferability of the beneficiaries' interest, whether a nominee trust or not, has held the trust did not qualify as a [bankruptcy] debtor." *In re Woodsville Realty Tr.*, 120 B.R. 2, 6 (Bankr. D.N.H. 1990); *see also Sung Soo Rim Irrevocable Tr.*, 177 B.R. at 678 ("Transferability of the trust's beneficial interest also appears to be critical in distinguishing between a 'business trust' and a traditional trust.").

**VI.     Conclusion.**

Given the foregoing, it is evident that the Trust is not a "business trust" under Section 101(9).  It is not a close question.  Since the Trust is not a "business trust," it follows that the Trust is not eligible to be a bankruptcy debtor under Sections 101(9), 101(41), and 109(d).  Therefore, the Trust's bankruptcy case must be dismissed.  Given the Court's conclusion, it is not necessary for the Court to consider the Secured Creditors' second argument in the Motion to Dismiss: that the Trust's bankruptcy case should be dismissed under Section 1112(b) because it was filed in bad faith. Accordingly, and for the reasons set forth above, the Court hereby

ORDERS that the Secured Creditors' Motion to Dismiss is GRANTED; and

FURTHER ORDERS that the Trust's bankruptcy case is dismissed.

DATED this 22nd day of January, 2024.

BY THE COURT:

_____
Thomas B. McNamara,
United States Bankruptcy Judge

45